**Terrolyn A. JOWERS,**
**Plaintiff-Appellee,**

v.

**NATIONWIDE INSURANCE COMPANY, Defendant-Appellant.**

**No. 87–8190.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 24, 1987.

As Amended on Denial of Rehearing
Feb. 11, 1988.

---

Dickey, Whelchel, Brown & Readdick, J. Thomas Whelchel, Brunswick, Ga., Alston & Bird, Atlanta, Ronald L. Reid, R. Wayne Thorpe, Atlanta, Ga., for defendant-appellant.

John T. McKnight, Brunswick, Ga., for plaintiff-appellee.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This case involves the alleged bad faith of an insurer in not timely paying policy benefits under the Georgia Motor Vehicle Accident Reparations Act, Ga.Code Ann. (O.C.G.A.) § 33–34–6 (1982). After a jury trial, the district court entered judgment in favor of the insured for $703 in compensatory damages, $175.75 in statutory damages,[1] $5,000 for attorney's fees, and $1,000,000 in punitive damages. We reverse and remand with directions.

## STATEMENT OF THE CASE

For Terrolyn Jowers, 1984 was not a good year. On May 14, 1984, Ms. Jowers was involved in an automobile accident while driving her father's car. Nationwide Insurance Company (Nationwide), the family's automobile insurer, paid various medical expenses of Ms. Jowers under the policy's Personal Injury Protection (PIP) coverage. On August 6, 1984, Ms. Jowers was involved in a second automobile accident, this time as a passenger in a friend's car. Her friend's automobile was insured by the Travelers Insurance Company (Travelers) and had a PIP policy limit of $2,500.

Prior to the first accident, Ms. Jowers had a history of headaches, neck pain, and dizziness. Between 1980 and May 1984 she was treated 16 times for these complaints by Edward Kaszans and his wife, Rosemary, both doctors of chiropractic.[2] Between the May and August accidents, Dr. Kaszans treated Ms. Jowers eight times for head and neck pains. Ms. Jowers met with Dr. Kaszans for a regularly scheduled visit on August 7, 1984, the day after the second accident. She did not tell him of her recent incident, however. Unaware of the second accident, Dr. Kaszans issued a report to Nationwide on August 10, 1984 stating that there had been "[n]o exacerbation of [Ms.

Jowers'] condition due to further trauma." He also noted that the patient had complained of severe headaches three times after the first accident and on August 7, 1984.

During the next few months, Ms. Jowers continued her treatment with Dr. Kaszans. Because her headaches were not decreasing in frequency or severity, Dr. Kaszans in late 1984 referred Ms. Jowers to Dr. Randall Long, a local neurologist. A portion of Dr. Long's subsequent report was read into the record. Dr. Long stated:

It is not entirely clear to me whence arises Ms. Jowers['] intermittent muscle spasm. I must also confess that her subjective symptoms have consistently been somewhat out of proportion to any objective findings. The fact that this is a compensation related problem is noted.

. . . .

In the event that her symptoms persist [after certain drug therapy], I think we may need to consider a referral for a second opinion.... I have also suggested that she discontinue chiropractic treatments for the time being, this most recent episode of a "muscle spasm" having coincided in time with same.

Because Travelers was responsible for the first $2,500 of medical expenses arising out of the second accident, Nationwide received no further bills until the spring or summer of 1985.[3] Portions of the record suggest that Nationwide began receiving bills in mid-May from Ms. Liberty Green, a massage therapist licensed by the State of Florida.[4] Ms. Green worked in Dr. Kaszans' office at the time and was referred work from him. Ms. Green testified that she saw Ms. Jowers two or three times a week from April through December 1985.

---

1. The jury awarded the insured $618.64 in statutory penalties. The district court reduced this award to 25 percent of the $703 award of compensatory damages.

2. Future references to "Dr. Kaszans" will refer only to Dr. Edward Kaszans.

3. Both parties agree that, excepting the $2,500 responsibility of the Travelers, Nationwide was responsible for all claims arising from both accidents. Nationwide's overriding concern, however, was that the claims of Ms. Jowers were not arising because of either accident, but because of some problem not covered by the policy.

4. Georgia apparently has no licensing provisions for massage therapists.

Dr. Kaszans continued to treat Ms. Jowers as well. In September, a bone scan was performed in an attempt to discover the cause of the headaches. When it proved unsuccessful, Ms. Jowers sought treatment from Dr. Robert Owen, an anesthesiologist. Dr. Owen performed a series of "trigger point" injections from September 10–30, 1985. The injections, however, did not stop the pain. Finally, in early October, Ms. Jowers sought treatment from Dr. H. Bert Yeargans, a dentist and specialist in treating problems associated with the temporomandibular joint (commonly called TMJ). Dr. Yeargans prescribed a "splint therapy" to prevent muscle spasms in the TMJ area.

During the fall of 1985, Nationwide received a number of bills for the treatment of Ms. Jowers. Testimony indicated that the following bills were sent to the insurance company:

| APPROXIMATE DATE SENT | CREDITOR | AMOUNT |
|---|---|---|
| September 11, 1985 | Ms. Green | unknown |
| September 12, 1985 | Dr. Owen | $225.00 |
| September 19, 1985 | Radiology Consultants | 85.00 |
| October 1, 1985 | Dr. Owen | 375.00 |
| October 2, 1985 | Dr. Kaszans | 75.00 |
| October 3, 1985— November 14, 1985 [5] | Ms. Green | 225.00 |
| October 10, 1985 | Dr. Yeargans | 799.00 |
| October 14, 1985 | Dr. Kaszans | 100.00 |
| October 21, 1985 | Dr. Kaszans | 25.00 |
| October 23, 1985 | Dr. Clary | 90.00 |

At some point during this interval, Nationwide became concerned about the amounts of the bills and the scope of the services being provided. On October 29, 1985, Nationwide forwarded Dr. Yeargans' bill for $799 to a dental consultant for study. On November 4, 1985, Nationwide scheduled an independent medical examination (IME) of Ms. Jowers as authorized under the policy. The IME was scheduled for December 2, 1985. On November 11, 1985, the dental consultant reported to Nationwide that Dr. Yeargans' $799 fee was excessive. The consultant suggested that Dr. Yeargans be paid up to $495 for his services instead. Later, Ms. Jowers cancelled the IME appointment and rescheduled it for December 13, 1985. Dr. Joseph Brown conducted the IME on that date and reported his preliminary findings to Nationwide on December 16, 1985. Dr. Brown wrote: "Clinically there were no objective findings to substantiate [Ms. Jowers'] subjective complaints, the chief one of which was headaches." Dr. Brown also suggested that he be allowed to see prior hospital records of Ms. Jowers before submitting a detailed report. That same day, Ms. Jowers filed suit against Nationwide, alleging bad faith in not timely paying benefits under the policy.

On March 3, 1986, Dr. Brown submitted a final report to Nationwide. The report reiterated his earlier conclusion that there was no objective substantiation of Ms. Jowers' claims. By that time, however, Nationwide had elected to pay the outstanding bills, with the exception of Dr. Yeargans'. Nationwide paid Dr. Yeargans only $495, as suggested by the dental consultant. Thus, when the case came on for trial, the only out-of-pocket expense possibly due Ms. Jowers was $304, the difference between the $799 charged her by Dr. Yeargans and the $495 paid him by Nationwide.

The jury returned a verdict through the use of several special interrogatories. The jury found that Ms. Jowers was entitled to $703 in additional medical expense benefits under the policy. It also decided that some bills were not paid within 30 days of Nationwide's receipt of reasonable proof of the facts and amounts of the claims and that Nationwide exercised bad faith in not doing so. Under O.C.G.A. § 33–34–6(b), the jury awarded Ms. Jowers $5,000 in attorney's fees and assessed a penalty against Nationwide in the amount of $618.64. The district court, apparently acting on its own motion, reduced the penalty amount to $175.75. Finally, the jury also found that Nationwide did not pay some bills within 60 days of receipt of reasonable proof of the loss. Under O.C.G.A. § 33–34–6(c), it assessed punitive damages at $1,000,000.

---

5. Ms. Green testified that she billed Nationwide every two weeks during this period. The total amount of these bills was $225.

## DISCUSSION

We begin by dividing the jury verdict into two parts: (1) the $703 award of compensatory damages for money due under the insurance policy, and (2) the award of statutory penalties, attorney's fees, and punitive damages under O.C.G.A. § 33–34–6. The majority of the discussion will focus on the construction of this Georgia statute.

### I. Compensatory Damages

The jury found that Ms. Jowers was entitled to $703 in "additional medical expense benefits under the insurance policy" issued by Nationwide. Both parties agree that this finding is incorrect. As noted above, Nationwide paid all but $304 of the outstanding medical bills before the trial began. Hence, $304 represented the maximum amount of money due Ms. Jowers under the insurance contract.

■ The reasoning behind Nationwide's decision to pay Dr. Yeargans only $495 rather than $799 is somewhat complex, and is discussed in part II.C.1., *infra*. At this point suffice it to say that Dr. Yeargans' pricing structure was ambiguous. Despite Nationwide's mild protestations to the contrary in its brief, however, we believe that the evidence is sufficient to support a finding that Ms. Jowers is entitled to $304 in compensatory damages. We therefore REVERSE the award of $703 for medical expense benefits due under the policy and REMAND for the entry of judgment in favor of Ms. Jowers for $304. *See, e.g., Mutual Savings Life Ins. Co. v. Hines*, 96 Ga.App. 442, 449–50, 100 S.E.2d 466, 472–73 (1957).

### II. Penalties and Punitive Damages

#### A. Introduction

The Georgia legislature passed the Georgia Motor Vehicle Accident Reparations Act, O.C.G.A. §§ 33–34–1 to –13, in 1974. One of the purposes of the Act is to minimize litigation by providing that insurance companies pay certain claims rapidly, thus reducing the insured's incentive to sue.

*See Teasley v. Mathis*, 243 Ga. 561, 563, 255 S.E.2d 57, 58 (1979). Unfortunately, however, as this case illustrates, the Act may be generating as much litigation as it prevents.

O.C.G.A. § 33–34–6(b) provides as follows:

Benefits required to be paid without regard to fault shall be payable monthly as loss accrues. The benefits are overdue if not paid within 30 days after the insurer receives reasonable proof of the fact and the amount of loss sustained. If reasonable proof is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after proof is received by the insurer.... In the event the insurer fails to pay each benefit when due, the person entitled to the benefits may bring an action to recover them and the insurer must show that its failure or refusal to pay was in good faith, otherwise the insurer shall be liable for a penalty not exceeding 25% of the amount due and reasonable attorney's fees.

The statute raises the stakes if the insurance company continues to delay payment. Section 33–34–6(c) states that:

In addition to all other penalties provided for in this Code section, in the event that an insurer fails or refuses to pay a person the benefits which the person is entitled to under this chapter within 60 days after proper proof of loss has been filed, the person may bring an action to recover the benefits; and, if the insurer fails to prove that its failure or refusal to pay the benefits was in good faith, the insurer shall be subject to punitive damages.

The keys to the statute are determining what constitutes "reasonable proof of the ... loss sustained" and what actions of the insurer show its "good faith." Only when the insurer receives the reasonable proof does the 30/60–day clock start running.[6] And, even if it delays payment beyond 30 or 60 days, the insurer may preclude its

---

**6.** Although O.C.G.A. § 33–34–6(b) uses the word "reasonable" and section 33–34–6(c) the word "proper," we believe that the subsections refer to the same level of proof of loss.

liability under the statute by proving that it exercised good faith.

### B. *Interpretation of the Statute*

Georgia courts have discussed the phrases "reasonable proof" and "good faith" many times since 1974. Reasonable proof appears to be information which would "enable the insurer to verify or disprove, through the exercise of reasonable diligence, the basic components of the insured's claim." *Jones v. State Farm Mutual Automobile Insurance Co.*, 156 Ga. App. 230, 235, 274 S.E.2d 623, 627 (1980). The reasonableness of the proof is a question for the factfinder rather than for the insurer. *See Hufstetler v. International Indemnity Co.*, 183 Ga.App. 606, 608, 359 S.E.2d 399, 401 (1987). The burden of proving that reasonable proof was submitted apparently lies with the insured, unlike the burden of proving good faith in delaying payment, which rests on the insurer. *See International Indemnity Co. v. Coachman*, 181 Ga.App. 82, 90, 351 S.E.2d 224, 232 (1986). However, when some proof of loss is submitted by an insured, the subsequent actions of the insurer may bear upon both issues of the reasonableness of the proof and the exercise of good or bad faith in delaying payment.

For example, in *Hufstetler* the insured made a claim for PIP benefits and included with the demand a schedule of medical expenses itemized as to treatment dates, facilities visited, and charges incurred. An accompanying letter requested that the insurer advise the insured immediately if further information was needed. No medical bills were included, however. Approximately 90 days later, the insurer wrote the insured and requested copies of the bills before it would issue payment. When the insured filed suit under O.C.G.A. § 33–34–6, the insurer defended on the ground that the insured had not submitted "reasonable proof" of the loss because she had not included medical bills with her claim. *See Hufstetler*, 183 Ga.App. at 606–07, 359 S.E.2d at 400–01.

The Georgia court reversed the trial court's judgment for the insurer. In doing so, it declined to determine explicitly whether the insured had submitted reasonable proof. Instead, the court looked to the subsequent actions of the insurer. Because the insurer took *no* action until 90 days had passed, it waived its right to complain about the reasonableness of the proof, and apparently delayed payment in bad faith as well. *See id.* at 608–09, 359 S.E.2d at 402. The court implied that had the insurer made some attempt to contact the insured within 30 days of receipt of the original information, the result might have been different. *See id.* at 609, 359 S.E.2d at 402 (citing cases where the insurer contacted the insured within 30 days stating that more information was needed to process the claim).

Another instance where the reasonableness of the proof and the good faith of the insurer overlap is when the insurer delays payment pending an IME. In *Hudson v. Omaha Indemnity Co.*, 183 Ga.App. 847, 360 S.E.2d 406 (1987), the court remarked:

> [W]hat the insured himself has offered in support of his claim does not necessarily constitute "reasonable proof" and "proper proof" thereof so as to trigger the applicability of the 30/60–day provisions of O.C.G.A. § 33–34–6. "... It can hardly be argued that an insurer cannot investigate what reasonably appears to be a questionable claim...." Thus, it has been recognized that the insurer, in the exercise of its right to investigate an insured's no-fault claim, may require that the insured further support the claim he has filed by submitting to an [IME]. However, the insurer cannot automatically insulate itself from potential liability under O.C.G.A. § 33–34–6 merely by requesting that the insured submit to an [IME]. The right of the insurer to require that the insured further submit to an [IME] "is limited by the reasonableness of its exercise under the circumstances." Thus, an insurer is "authorized to withhold payment of [a no-fault] claim beyond thirty [or sixty] days, pending [an IME], only if the suspicions prompting the requiring of the [IME] were reasonable."

*Id.* at 848–49, 360 S.E.2d at 407–08 (bracketed phrases not referring to "IME" in original) (citations omitted).

*Hudson* and *Falagian v. Leader National Insurance Co.*, 167 Ga.App. 800, 307 S.E.2d 698 (1983), both involved delays pending the results of an IME. In *Falagian*, the insured originally submitted two chiropractic bills totaling $1168 to its insurer. Those bills were paid promptly. Later in the same month, the insured submitted another $850 chiropractic bill to the insurer. These large bills caused the insurer to become suspicious of the claim, particularly since the accident report "had not indicated any injury to the insured." *Id.*, 307 S.E.2d at 699. The Georgia court agreed with the trial court that the insurer was justified in withholding payment pending the IME. The insurer's delay, therefore, was not the exercise of bad faith. *See id.* at 802, 307 S.E.2d at 700.

Likewise, the *Hudson* court found no bad faith in delaying payment. Noting that the facts were "virtually identical" to those in *Falagian*, the court affirmed a judgment for the insurer. *See Hudson*, 183 Ga.App. at 849, 360 S.E.2d at 408. The *Hudson* court also found that, by filing suit, the insured stopped the 30/60–day clock:

> Less than 30 days after [the insurer] had received the results of the [IME, the insured], by filing suit for penalties, punitive damages, and attorney's fees, gave advance notice, in effect, that he would not accept payment of merely the no-fault benefits.... A "notification in advance that [a payment] will not be accepted waives the tender of [it]."

*Id.* (last two bracketed phrases in original) (citation omitted); *see also Bowers v. Continental Ins. Co.*, 753 F.2d 1574, 1578 (11th Cir.) ("A period of bad faith withholding after suit is filed is insufficient under Geor-

gia law."), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).

## C. *The Issue*

 ▮ Turning to the case at hand, we must decide whether the district court erred in denying Nationwide's alternative motions for a judgment non-obstante veredicto (JNOV) or a new trial. We may grant a JNOV if the evidence is not of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. *See Anderson v. City of Atlanta*, 778 F.2d 678, 682 (11th Cir.1985). The standard of review for the denial of a new trial motion is whether the trial court abused its discretion in determining that the verdict was not contrary to the great weight of the evidence. *See Jackson v. Magnolia Brokerage Co.*, 742 F.2d 1305, 1307 (11th Cir.1984). In this regard, we note that on two occasions the Georgia courts have stated that "[t]he question of [the] reasonableness [of the insurer's actions] is generally for the jury ..., but there are instances in which it can be decided as a matter of law by the court." *Hudson*, 183 Ga.App. at 849, 360 S.E.2d at 408 (quoting *Falagian*, 167 Ga.App. at 801, 307 S.E.2d at 700).

Nationwide argues that its action in scheduling an IME was reasonable as a matter of law. It contends that it was properly suspicious of Ms. Jowers' claims and therefore was justified in withholding payment beyond the statutory time periods.[7] Nationwide also argues that it is entitled to a new trial because the evidence supported an award of only $304 in compensatory damages, rather than the $703 awarded by the jury. However, because we have remitted the compensatory damages due Ms. Jowers, *see* part I, *supra*, we decline to order a new trial on that ground. Finally, Nationwide asserts that the $1,000,000 punitive damage award was "unreasonably excessive."[8]

---

**7.** Nationwide argues that the jury may consider events that occurred *after* the insurer decided to schedule the IME in determining whether Nationwide exercised good faith, citing *Interstate Life & Accident Insurance Co. v. Williamson*, 220 Ga. 323, 326, 138 S.E.2d 668, 670 (1964). In

light of our decision, *infra*, we decline to address this argument.

**8.** Nationwide also asserts that the size of the award violates the excessive fines clause of the eighth amendment to the United States Constitution. *See Aetna Life Insurance Co. v. Lavoie*,

In response, Ms. Jowers argues that reasonable persons could differ as to the basis underlying Nationwide's actions. Because different conclusions could be reached based on the evidence, the trial court properly denied the JNOV motion. Ms. Jowers points to eight sets of bills that were paid more than 60 days after their submission to Nationwide: (1) the May 13, 1985 sequence of bills from Ms. Green; (2) the September 19, 1985 bill from Radiology Consultants; (3) the October 1, 1985 bill from Dr. Owen; (4) the October 2, 1985 bill from Dr. Kaszans; (5) the October 3, 1985 sequence of bills from Ms. Liberty Green; (6) the October 10, 1985 bill from Dr. Yeargans; (7) the October 14, 1985 bill from Dr. Kaszans; and (8) the October 23, 1985 bill from Dr. Clary.[9] Dr. Kaszans also testified that Nationwide delayed payment more than 30 days on eight occasions between March 1986 and December 1, 1986, the date of the trial. Ms. Jowers contends that the punitive damages award should stand as well. The award was not tainted with "bias or passion" and need not be proportional to the amount of compensatory damages. Ms. Jowers also argues that should this court overturn the award, a remittitur, rather than a new trial, would be the appropriate remedy.

We hold that Nationwide's scheduling of an IME in this case was reasonable as a matter of law. The company was therefore justified in not paying bills pending the results of the IME. Because of this finding, we must examine the state of Nationwide's payments as of November 4, 1985, the date it requested the IME. Statutory liability for any unpaid bills less than 30 days old on that date was excused pending receipt of the examination results. Additionally, liability accruing for any bills unpaid after December 16, 1985 was excused because of Ms. Jowers' action in

filing suit. However, because the jury could infer that several bills remained unpaid more than 30 or 60 days *prior* to November 4, 1985, we must remand for a redetermination of Nationwide's liability under O.C.G.A. § 33–34–6. We have no need at this time to address specifically Nationwide's claim that the punitive damages award was excessive.

### 1. *Scheduling the IME*

In some cases the court may determine the reasonableness of the insurer's actions. This is one of those cases. Based on the information before it on November 4, 1985, Nationwide was justified in suspending further payments to Ms. Jowers pending an IME. The insurer therefore did not act in bad faith in scheduling the IME.

Although neither *Hudson* nor *Falagian* involved a JNOV motion, we believe the circumstances in those cases to be instructive here.[10] The cases involved large chiropractic bills submitted in a short time interval. The *Falagian* court also noted that the accident report did not indicate that the insured had been injured. Much the same situation occurred here. Nationwide had before it two documents raising questions about Ms. Jowers' claims. Both documents were written by doctors retained by Ms. Jowers: Dr. Kaszans wrote Nationwide indicating no change in Ms. Jowers' condition as of August 10, 1984, and Dr. Long reported questions about Ms. Jowers' symptoms and suggested that a second opinion be obtained. Moreover, Nationwide too had received billings for large amounts within a short time interval. Most telling of these bills is the one submitted by Dr. Yeargans. On its face, the bill purported to charge $799 for a number of services performed on one day. In actuality, the fee included charges for a number of follow-up office visits to occur in the future. However, as Dr. Yeargans himself

505 So.2d 1050, 1061 (Ala.1987) (Houston, J., concurring specially). We find this argument particularly unpersuasive.

**9.** The record also suggests that the October 21, 1985 bill from Dr. Kaszans remained unpaid for more than 60 days after submission to Nationwide. This bill is no different from bills (6)-(8), however, in determining Nationwide's liability under O.C.G.A. § 33–34–6.

**10.** In *Falagian,* the court affirmed the trial court's grant of summary judgment in favor of the insurer. *Falagian,* 167 Ga.App. at 802, 307 S.E.2d at 700. To obtain summary judgment, a movant must show an entitlement to judgment as a matter of law. *See, e.g., Clements v. Warner Robins Supply Co.,* 235 Ga. 612, 613, 221 S.E.2d 35, 37 (1975).

admitted, that fact was not discernable from the bill itself.[11]

In fact, Ms. Jowers apparently concedes that Nationwide was justified in scheduling an IME. She notes in her brief: "[Ms. Jowers] does not dispute that Nationwide had a right to require her to submit to a medical examination, at least if it had reason to question one or more of her claims, *and would even agree [that] Dr. Kaszans' reports warranted Nationwide in seeking an [IME]*." (Appellee's Brief at 20–21) (emphasis added). Given this statement, and the information available to Nationwide on November 4, 1985, we can only conclude that Nationwide acted in good faith in scheduling the IME. Nor could fair-minded persons decide otherwise. Because it acted in good faith, Nationwide was entitled to withhold medical payments pending the results of the IME.[12]

 Of the eight sets of bills unpaid more than 60 days, three of them (numbers (6)-(8)) clearly were received by Nationwide less than 30 days before it scheduled the IME. Nationwide was therefore authorized to withhold payment of these sums at least through December 16, 1985, when it received the preliminary results of the IME. However, since Ms. Jowers filed suit immediately thereafter, she waived tender of those monies pending the outcome. *See Hudson*, 183 Ga.App. at 849, 360 S.E.2d at 408. Thus, these three bills should not have been before the jury. Likewise, the eight delinquent payments referred to by Dr. Kaszans as occurring after the filing of the suit should not have been considered by the jury. In addition, none of sets (2)-(7) remained unpaid more than 60 days prior to

November 4, 1985, when Nationwide scheduled the IME. None of these bills, therefore, could have supported the jury's $1,000,000 punitive damages award. As we read the record, the only remaining evidence possibly supporting the award of punitive damages is Ms. Green's statement that she did not receive payment from Nationwide for her May 13, 1985 billing until July 26, 1985, more than 70 days after it was sent.[13] Even assuming that the jury could properly find that Nationwide received the bill more than 60 days before it was paid and exercised bad faith in withholding payment, this evidence obviously could not support a punitive damages award on the order of $1,000,000. We believe that the evidence regarding the other unpaid bills was improperly considered by the jury. When it appears that the jury was influenced by a mistake or erroneous ruling of law, an appellate court may reverse a verdict and remand for a new trial. *See* 5 Am.Jur.2d *Appeal & Error* § 836 (1962). *Cf. Moffa v. Perkins Trucking Co.*, 200 F.Supp. 183, 189 (D.Conn.1961) (indicating that jury verdict may be overturned under Connecticut law if deliberations are influenced by a mistake or erroneous ruling of law). As a matter of law, Nationwide was absolved from liability accruing after November 4, 1985.

Even though all of the bills were admitted into evidence without objection, only the May 13, 1985 bill of Ms. Green provided any evidence relevant to the issue of punitive damages. If there was a bad faith 60–day delay in paying this bill, this could authorize an award of punitive damages in some amount. The record does not disclose the exact amount of this bill, although the evidence of

---

11. Nationwide submitted Dr. Yeargans' bill to Dr. Michael Kreisberg, a practicing dentist and faculty member of the Emory University School of Dentistry. Dr. Kreisberg disagreed with Dr. Yeargans' diagnosis, but agreed that the treatment was proper in certain respects. He found that the fee charged by Dr. Yeargans for the services listed was excessive, and recommended that Nationwide pay only $435 to $495. Neither Nationwide nor Dr. Kreisberg knew that Dr. Yeargans' fee included charges for future treatment.

12. We note that we are not passing on the merits of Ms. Jowers' medical claims. We simply have decided that Nationwide acted reasonably

in being suspicious of them to the extent of scheduling an IME and suspending payments pending the results of the exam.

13. Ms. Green testified that she billed Nationwide every two weeks during the period May 13, 1985 through July 19, 1985. She received a lump sum payment from Nationwide for these billings on July 26, 1985. According to her testimony, then, her second and subsequent bills would have been submitted on or after May 27, 1985, a date not greater than 60 days prior to July 26, 1985. Thus, the only bill that possibly could have remained unpaid more than 60 days after receipt was the one dated May 13, 1985.

Ms. Green's other bills indicates that it would under no circumstances have exceeded $100 in amount. Therefore, the maximum the jury could have found to have been delayed in bad faith for more than 60 days was the sum of $100. As noted above, the great weight of the relevant evidence does not support an award of $1,000,000 in punitive damages. Because the verdict was against the great weight of the evidence, the trial court abused its discretion in not ordering a new trial.

### 2. *Bills Received More Than 30 Days Prior to November 4, 1985*

Our holding that Nationwide acted properly in scheduling the IME does not dispose of the case, however. Evidence in the records leaves open the possibility that Nationwide may have received several bills (numbers (1)-(5)) more than 30 days prior to November 4, 1985, when it first took action regarding them. If Nationwide indeed *received* some more than 30 days before November 4, 1985, its silence may render it vulnerable to liability under *Hufstetler*. As noted above, Ms. Green testified that her bill dated May 13, 1985 was not paid until July 26, 1985. If Nationwide indeed received that bill more than 60 days before paying it, Nationwide may be liable for some punitive damages as well.[14]

▇ Because we remand for a new trial as to liability and damages under O.C.G.A. § 33-34-6, we offer the following directions. First, we believe that both the trial court and Ms. Jowers misunderstood the computation used in awarding statutory penalties under section 33-34-6(b). The section states that should an insurer withhold payment in bad faith more than 30 days after receipt of reasonable proof, it "shall be liable for a penalty not exceeding 25 percent of the amount due." The trial court apparently believed that "amount due" meant "amount unpaid at trial," because it reduced the jury's penalty figure

to 25 percent of the amount it understood that Nationwide still owed Ms. Jowers. Under this approach, if Nationwide had paid all outstanding bills before trial, it would have reduced the "amount unpaid at trial" to zero and had *no* liability under section 33-34-6(b), regardless of how long the bills remained outstanding before being paid. Surely the Georgia legislature did not intend such a result. Instead, we believe that the penalty should be assessed based on the amount of all bills wrongfully unpaid more than 30 days after receipt. Under this interpretation, the jury must add the amounts of the bills wrongfully unpaid more than 30 days, whether or not the bills were subsequently paid by the insurer. The penalty should then be computed as up to 25 percent of this amount.

Second, based on our review of the record, the jury must determine the following on re-trial:

i. *30-day liability*

1. Whether Nationwide refused to pay Ms. Green within 30 days of receipt of any of her bills dated May 13, 1985 through July 19, 1985 or August 2, 1985 through September 11, 1985. If so, which bills were not paid timely. Of those, whether Nationwide acted in bad faith in not paying within the 30 day interval.

2. Whether Nationwide received the September 19, 1985 bill from Radiology Consultants more than 30 days prior to November 4, 1985. If so, whether Nationwide acted in bad faith in not paying within the 30 day interval.

3. Whether Nationwide received the October 1, 1985 bill from Dr. Owen more than 30 days prior to November 4, 1985. If so, whether Nationwide acted in bad faith in not paying within the 30 day interval.

---

**14.** Nationwide contends that payments to massage therapists are not required under the Georgia Motor Vehicle Accident Reparations Act. O.C.G.A. § 33-34-4(a)(2)(A) does not explicitly refer to services of a masseuse, but does require payment for "rehabilitative services" and "nursing services as [authorized] by an attending physician." Because Nationwide actually paid Ms. Green, we do not pass on this argument. However, on retrial Nationwide may assert this uncertainty in the law as bearing on its good faith in withholding initial payments to Ms. Green. *See, e.g., Russell v. Dairyland Insurance Co.,* 580 F.Supp. 726, 730 (N.D.Ga.1984) ("There is no bad faith when a doubtful question of law is involved.").

4. Whether Nationwide received the October 2, 1985 bill from Dr. Kaszans more than 30 days prior to November 4, 1985. If so, whether Nationwide acted in bad faith in not paying within the 30 day interval.

5. Whether Nationwide received the October 3, 1985 bill from Ms. Green more than 30 days prior to November 4, 1985. If so, whether Nationwide acted in bad faith in not paying within the 30 day interval.

The jury must then add the amounts of the bills withheld in bad faith more than 30 days (if any) and assess a penalty against Nationwide not to exceed 25 percent of that sum. If at least one bill was wrongfully unpaid, the jury may also award attorney's fees to Ms. Jowers.

ii. *60–day liability*

1. Whether Nationwide refused to pay Ms. Green within 60 days of receipt of her bill dated May 13, 1985. If so, whether Nationwide acted in bad faith in not paying within the 60 day interval.

If the jury finds this bill to have been wrongfully unpaid more than 60 days, it may assess punitive damages against Nationwide.[15]

### SUMMARY

We REVERSE the $703 award of additional medical expense benefits due Ms. Jowers under the policy and REMAND for entry of judgment in her favor for $304.

We REVERSE the award of $175.75 in statutory penalties and $5,000 in attorney's fees and REMAND for proceedings not inconsistent with part II.C.2.i., *supra.*

We REVERSE the award of $1,000,000 in punitive damages and REMAND for proceedings not inconsistent with part II.C. 2.ii., *supra.*

### REVERSED and REMANDED.

**15.** While we recognize that the amount of an award for punitive damages need not be strictly proportional to the amount of actual damages awarded, we also note that "[punitive] damages should not go beyond deterrence and become a windfall." *Lenard v. Argento,* 699 F.2d 874, 890

(7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). *Cf.* O.C.G.A. § 51–12–5.1(g) (Supp.1987) (limiting punitive damages awards to $250,000 in certain actions arising on or after July 1, 1987).