547 So.2d 812 (1988)
INDUSTRIAL CHEMICAL AND FIBERGLASS CORPORATION
v.
Lynn B. CHANDLER, et al.
INDUSTRIAL CHEMICAL AND FIBERGLASS CORPORATION
v.
Peggy Ann ENSLEY, et al.
86-381, 86-385.
Supreme Court of Alabama.
September 30, 1988.
Opinion After Remand January 16, 1989.
Rehearing Denied June 23, 1989.
*814 T. Thomas Cottingham, F.A. Flowers and Marion W. Tilson of Burr & Forman, Birmingham, for appellant.
Lloyd W. Gathings of Gathings & Tucker and Lanny S. Vines of Emond & Vines, Birmingham, for appellees.
ADAMS, Justice.
Industrial Chemical and Fiberglass Corporation, a distributor of fiberglass products and supplies, appeals from a judgment based upon a jury verdict awarding Lynn B. Chandler and Peggy Ann Ensley $2.5 million each on their claims against Industrial Chemical, alleging, first, under the Alabama Extended Manufacturer's Liability Doctrine, that its negligent failure to warn wrongfully caused the deaths of their husbands, Terry D. Chandler and Dewey E. Ensley, Jr., employees of J.M. Foster, Inc., and, second, that it breached its implied warranty of merchantability in providing J.M. Foster certain chemicals for use in the construction and repair of an acid regeneration plant in Fairfield.
J.M. Foster contracted to repair the cracked floors of three cylindrical fiberglass tanks, which were 35 feet high and 11 feet in diameter. The only openings were a 24-inch hole at the top of the tank, through which laborers were lowered on a bosun's chair, and a six-inch hole at the base of the tank for ventilation. The project's general contractor ordered the repair materials and the required chemicals by telephone from Industrial Chemical in Atlanta, Georgia. An employee of J.M. Foster was sent to bring them to the construction site. The materials and chemicals consisted of fiberglass cloth and mat, polyester resin, cobalt naphthenate, methyl ethyl ketone peroxide (MEKP), and acetone.
*815 Reichold Chemicals, Inc., the manufacturer of the MEKP, had provided Industrial Chemical with MEKP's "Material Safety Data Sheet and Technical Bulletin," but testimony indicated that the safety data sheet and technical bulletin were not forwarded to the construction site or given to the J.M. Foster employee who picked up the chemical. MEKP's technical bulletin warns that it should be used only with glass, polyethylene, or ceramic containers; that metals contacting MEKP may cause it to decompose; and that spillage should be wiped up immediately. Testimony further indicated that the material safety data sheet warned against contact between MEKP and copper, brass, lead, iron, or zinc. The MEKP container label warned that its contamination could result in explosive decomposition, and the resin was marked flammable.
The repair procedure was to mix the resin with the cobalt naphthenate outside at the project site and lower it on a handline through the top manhole into the tank. A container of MEKP, which caused the resin to harden when mixed with it, was placed in a bucket galvanized with zinc and also lowered into the tank; after the MEKP was poured into a measuring bottle over the galvanized bucket, it was mixed with the resin. The fiberglass mat was applied to the floor of the tank by laborers inside and saturated with the resin, which was applied with paint rollers. No fire extinguishers were in the tanks.
Following this procedure, Terry Chandler and Dewey Ensley descended into one of the tanks on July 6, 1980. A co-worker remained on top of the tank to signal a crane operator to pull up the bosun's chair in case of an accident. During the repair process, MEKP spilled into the bucket, reacted with its galvanized zinc coating and the heat in the tank, decomposed, and "blazed up." As the tank filled with flames and smoke, both men attempted to get to the tank's top on the bosun's chair, but only Ensley was brought out. Chandler was found dead on the floor of the tank, and Ensley died 18 days later with second and third degree burns covering 65% of his body and with chemical damage to his lungs.
In sum, Lynn Chandler and Peggy Ensley claimed that Industrial Chemical failed to warn of the reaction of MEKP with the zinc lining of the bucket and to warn that spillage of MEKP should be wiped up immediately. At the close of the plaintiffs' evidence and again at the close of the defendant's evidence, the trial court denied Industrial Chemical's motion for directed verdict. After the jury's verdict, Industrial Chemical's motion for judgment notwithstanding the verdict, or, in the alternative, for new trial, was also denied. The issues on appeal are whether the punitive damages award against Industrial Chemical violates its rights under the Eighth Amendment to the United States Constitution; whether Lynn Chandler and Peggy Ann Ensley lacked capacity to assert claims for Industrial Chemical's breach of implied warranty; whether the trial court erred in denying Industrial Chemical's motion for JNOV on the claims for Industrial Chemical's breach of implied warranty; and whether the trial court erred in failing to state in the record its reasons for refusing to interfere with the jury verdict on grounds of excessiveness of the damages.

I
Industrial Chemical argues that the trial court's judgment on Chandler and Ensley's wrongful death claims should be reversed because the punitive damages award violates its rights under the Eighth Amendment to the United States Constitution, and in support of its argument offers a twostep analysis: First, Industrial Chemical submits that the Eighth Amendment prohibitions against excessive bail, excessive fines, and the infliction of cruel and unusual punishment are applicable to civil, as well as criminal, proceedings. Second, Industrial Chemical suggests that application of the Eighth Amendment to a punitive damages award requires proportionality between the "penalty" and the "circumstances" of the case, and Industrial Chemical argues that, in arriving at the correct proportion, one must consider the culpability of the defendant, the desirability of preventing *816 future similar wrongs, and the impact on the defendant as the guiding criteria.
We begin our analysis with Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Ingraham petitioners, students in a Florida junior high school, filed suit for damages and injunctive and declaratory relief against school officials, alleging that they had been subjected to disciplinary corporal punishment in violation of their Eighth Amendment constitutional rights. Limiting itself to the issue of whether the paddling of students as a means of maintaining school discipline constituted cruel and unusual punishment, the Court established the constitutional boundaries of the Eighth Amendment:
"Bail, fines, and punishment traditionally have been associated with the criminal process, and by subjecting the three to parallel limitations in the text of the Amendment suggests an intention to limit the power of those entrusted with the criminal-law function of government. An examination of the history of the Amendment and the decisions of this Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes. We adhere to this longstanding limitation and hold that the Eighth Amendment does not apply to the paddling of children as a means of maintaining discipline in public schools.

"A
"The history of the Eighth Amendment is well known. The text was taken, almost verbatim, from a provision of the Virginia Declaration of Rights of 1776, which in turn derived from the English Bill of Rights of 1689. The English version, adopted after the accession of William and Mary, was intended to curb the excesses of English judges under the reign of James II. Historians have viewed the English provision as a reaction either to the `Bloody Assize,' the treason trials conducted by Chief Justice Jeffreys in 1685 after the abortive rebellion of the Duke of Monmouth, or to the perjury prosecution of Titus Oates in the same year. In either case, the exclusive concern of the English version was the conduct of judges in enforcing the criminal law. The original draft introduced in the House of Commons provided:
"`The requiring of excessive bail of persons committed in criminal cases and imposing excessive fines, and illegal punishments, to be prevented.'
Although the reference to `criminal cases' was eliminated from the final draft, the preservation of a similar reference in the preamble indicates that the deletion was without substantive significance. Thus, Blackstone treated each of the provision's three prohibitions as bearing only on criminal proceedings and judgments.
"The Americans who adopted the language of this part of the English Bill of Rights in framing their own State and Federal Constitutions 100 years later feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured. [Citation omitted.] Indeed, the principal concern of the American Framers appears to have been with the legislative definition of crimes and punishments. [Citations omitted.] But if the American provision was intended to restrain government more broadly that its English model, the subject to which it was intended to apply the criminal processwas the same.
"At the time of its ratification, the original Constitution was criticized in the Massachusetts and Virginia Conventions for its failure to provide any protection for persons convicted of crimes. This criticism provided the impetus for inclusion of the Eighth Amendment in the Bill of Rights....

"B
"In light of this history, it is not suprising to find that every decision of this Court considering whether a punishment is `cruel and unusual' within the meaning of the Eighth and Fourteenth Amendments *817 has dealt with criminal punishment....
"These decisions recognize that the Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such. We have recognized the last limitation as one to be applied sparingly. `The primary purpose of [the Cruel and Unusual Punishments Clause] has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes....' [Citations omitted.]
"In the few cases where the Court has had occasion to confront claims that impositions outside the criminal process constituted cruel and unusual punishment, it has had no difficulty finding the Eighth Amendment inapplicable. Thus, in Fong Yue Ting v. United States, 149 U.S. 698, 37 L.Ed. 905, 13 S.Ct. 1016 (1893), the Court held the Eighth Amendment inapplicable to the deportation of aliens on the ground that `deportation is not a punishment for crim.' [Citations omitted.] And in Uphaus v. Wyman, 360 U.S. 72, 3 L.Ed.2d 1090, 79 S.Ct. 1040 (1959), the Court sustained a judgment of civil contempt, resulting in incarceration pending compliance with a subpoena, against a claim that the judgment imposed cruel and unusual punishment. It was emphasized that the case involved `essentially a civil remedy designed for the benefit of other parties ... exercised for centuries to secure compliance with judicial decrees.'"
Ingraham, 430 U.S. at 664-68, 97 S.Ct. at 1408-10.
Although Ingraham specifically addresses the cruel and unusual punishment clause, the Eleventh Circuit Court of Appeals recently addressed the question of the application of the excessive fines clause to civil proceedings:
"Although Ingraham addressed the Cruel and Unusual Punishment Clause of the Eighth Amendment, its language applies with equal force here: `Not only the connotation of the words "bail," and "fine," but the legislative history concerning enactment of the bill of rights supports an argument that the Eighth Amendment was intended to be applied only to punishment invoked as a sanction for criminal conduct.' [Citation omitted.] In Jowers [v. Nationwide Insurance Co., 832 F.2d 1246 (11th Cir.1988) ], this Court rejected an argument identical to that raised by Exide: `Nationwide also asserts that the size of the [punitive damages] award violates the excessive fines clause of the eighth amendment to the United States Constitution. We find this argument particularly unpersuasive.' 832 F.2d at 1252 n. 8 (citation omitted). Consequently, we hold that the Excessive Fines Clause does not apply in the civil context.
"Finally, if the Excessive Fines Clause were to apply to civil cases, we conclude that the $3.5 million punitive damages award is not excessive. Although Exide does not suggest any analysis for determining whether the award is excessive under the Eighth Amendment, we believe an appropriate test would be whether the award is so large as to shock the judicial conscience...."
Electro Services, Inc. v. Exide Corp., 847 F.2d 1524, 1530 (11th Cir.1988).
Industrial Chemical asserts, however, that some punishments, though not labeled "criminal" by the government, are sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. For this assertion, it cites Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). In Trop, the petitioner's application for a passport was denied on the ground that under § 401(g) of the Nationality Act of 1940, as amended, he had lost his citizenship by reason of his court-martial conviction and dishonorable discharge for wartime desertion. The Court addressed the constitutional question of whether § 401(g) was a penal law, and, *818 if so, whether denationalization was a cruel and unusual punishment within the meaning of the Eighth Amendment:
"In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishmentthat is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature."
Trop, 356 U.S. at 96, 78 S.Ct. at 595. Thus, Industrial Chemical argues that Alabama's wrongful death statute is a penal statute subject to the Eighth Amendment, regardless of its civil character.
Although damages recoverable in an Alabama wrongful death action are punitive in nature (Tatum v. Schering Corp., 523 So.2d 1042 (Ala.1988)), the wrongful death statute, first passed by the Alabama legislature in 1872, has been historically held to be nonpenal in effect:
"Lacerated feelings of surviving relations, and mere capacity of deceased to make money if permitted to live, do not constitute the measure of recovery under the act of Feb. 5, 1872. Prevention of homicide is the purpose of the statute, and this it proposes to accomplish by such pecuniary mulct as the jury `deem just.' The damages are punitive, and they are none the less so, in consequence of the direction the statute gives to the damages when recovered. They are assessed against the railroad to `prevent homicides.'"
Savannah & Memphis R.R. v. Shearer, Adm'x, 58 Ala. 672 (1877). In South & N.A.R.R. v. Sullivan, Adm'r, 59 Ala. 272 (1877), the Court acknowledged that the statute is "punitive" in its purposes, but that "[p]reservation of lifeprevention of its destruction by the wrongful acts or omission of another,is the subject of the statute; and all its provisions are but machinery for carrying it into effect."
The United States Supreme Court recognized the nonpenal effect of the statute in its 1927 opinion affirming this Court's holding in Louis Pizitz Dry Goods Co. v. Yeldell, 213 Ala. 222, 104 So. 526 (1925): "The Supreme Court of Alabama has repeatedly ruled that the statute is aimed at the prevention of death by wrongful act or omission. [Citations omitted.] `The statute is remedial, and not penal, and was designed as well to give a right of action where none existed before, as to "prevent homicides," and the action is purely civil in its nature for the redress of private, and not public wrongs.' [Citation omitted.]" Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927). And as recently as 1986, we held the purpose of the statute to be "the protection of human life and the prevention of homicides by wrongful act, omission, or negligence of persons or corporations." Mattison v. Kirk, 497 So.2d 120 (Ala.1986).
Therefore, based on these considerations, we hold that punitive damages awarded in a civil proceeding are not subject to the constitutional restrictions of the Eighth Amendment, which applies to criminal proceedings only. Further, the Alabama wrongful death statute is not penal in effect and is not of that class of cases sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. Therefore, we do not reach Industrial Chemical's suggestion that the amendment requires proportionality between the "penalty" and the "circumstances" of the case.[1]
*819 II
Industrial Chemical submits that Lynn Chandler and Peggy Ann Ensley lacked capacity to assert claims for Industrial Chemical's breach of implied warranty because Ala.Code 1975, § 6-5-462, provides that "all claims upon which no action has been filed on a contract, ... survive in favor of and against personal representatives...." Therefore, because the warranty claims were brought by the "dependent" widows and "dependent" minor children and by not the "personal representatives" of the estates of Terry Chandler and Dewey Ensley, Industrial Chemical argues that it is entitled to judgment on the claims as a matter of law.
For authority, Industrial Chemical cites Benefield v. Aquaslide `N' Dive Corp., 406 So.2d 873 (Ala.1981), and its statement that,
"The breach of warranty (contract) claim is a separate and distinct claim from the wrongful death (tort) claim and seeks compensatory damages only, not for the wrongful death of the decedent but for the injuries suffered before his death. It would be illogical to merge the two claims."
Aquaslide `N' Dive, 406 So.2d at 876. The claims against Industrial Chemical for wrongful death and breach of warranty were brought, however, under Ala.Code 1975, § 25-5-11(a) (Alabama's Workmen's Compensation Act), which provides that if the employee's death is caused under circumstances that create liability on the part of a third party, his dependents may bring an action against the third party to recover damages. See Liberty Mutual Ins. Co. v. Lockwood Greene Eng., Inc., 273 Ala. 403, 140 So.2d 821 (1962).
When reconciled with the sole cause of action for wrongful death in Alabama (Ala.Code 1975, § 6-5-410), "§ 25-5-11(a) gives to the dependents of an employee killed under circumstances creating liability against a third party a right to commence an action against such third party," although the action is deemed to arise under § 6-5-410. Alabama Power Co. v. White, 377 So.2d 930 (Ala.1979), citing Nicholson v. Lockwood Greene Engineers, Inc., 278 Ala. 497, 179 So.2d 76 (1965). There can be no discernible distinction between a claim for wrongful death (a tort claim) against a third party brought pursuant to § 25-5-11(a), and a claim for breach of warranty (a contract claim) brought pursuant to § 25-5-11(a). Therefore, we hold that the principle that allows the dependent to bring a third-party claim for wrongful death under § 25-5-11(a), i.e., to avoid the necessity of administration of the estate, also allows the dependent to bring a thirdparty claim for breach of warranty under § 25-5-11(a).
Moreover, it would be untenable, on the one hand, to allow the widow of a deceased employee to maintain a third-party wrongful death claim in her individual capacity as a dependent, and, on the other hand, to require her to maintain her Aquaslide breach of warranty claim against the same third party in her representative capacity as administratrix or executrix of her deceased husband's estate.

III
The third issue for review is whether the trial court erred in denying Industrial *820 Chemical's motion for JNOV on the claims for breach of warranty. Industrial Chemical, citing Benefield v. Aquaslide `N' Dive Corp., supra, contends that a claim for breach of warranty, when death is the result, may be maintained only for compensatory damages for "injuries and expenses suffered by the decedent between the date of his injury and the date of his death," and that Lynn Chandler failed to produce any evidence that her husband, Terry Chandler, survived for more than seconds in the tank and suffered physical pain and mental anguish as a result of the fire.
The standard of review applicable to a motion for JNOV is identical to the standard used by the trial court in granting or denying the motion initially. Turner v. Peoples Bank of Pell City, 378 So.2d 706 (Ala.1979). Thus, when reviewing the trial court's ruling on the motion, we determine whether there is sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala.1980). And, like the trial court, we must view any evidence below most favorably to the nonmovant. Ritch v. Waldrop, 428 So.2d 1 (Ala.1982).
A witness standing on the tank at the time of the fire testified:
"Q: What happened?
"A: They were coming out and I couldn't see. I was trying to see them, to see when the headache ball got up there, and they were hollering and screaming. One of them was hollering `go, go.' The other one was hollering, `Oh God.'
"And Eddie [Dewey Ensley] came out and Terry screamed real.... Eddie came out. And Eddie's pants were on fire, and the rig had swung over and let him down on the ground."
Terry Chandler's body was found on the floor of the tank after an opening was cut in its side, and this testimony is the only indication of how long he survived the MEKP contamination and subsequent fire.
Damages can be awarded only where they are reasonably certain and not based upon speculation. "This does not mean that the plaintiff must prove damages to a mathematical certainty or measure them by a money standard. Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference." C. Gamble, Alabama Law of Damages § 7-1 (2d ed. 1988). (Citations omitted.) Industrial Chemical submits persuasive authority to the effect that "a mere allegation that the decedent lived and suffered is insufficient where the record only supports a finding of almost instantaneous death. Magee v. Rose, 405 A.2d 143 (Del.1979)." "Instantaneous" is defined as "done without any perceptible duration of time"; "instant" is defined as "an infinitesimal space of time." Webster's Third New International Dictionary (1971).
The reconciliation of the competing interests before usspeculation, mathematical certainty, reasonable inference, instantaneous deathis made more difficult in light of the facts. There is no precise calculation of the length of time Terry Chandler suffered before dying in the tank while it burned, no formula by which to measure his physical pain and mental anguish. But with testimony that either Terry Chandler or Dewey Ensley screamed "go, go," while the other screamed "Oh, God," we cannot say that the jury was not presented with sufficient evidence to produce a reasonable inference favorable to the plaintiff's claim.
"[T]here is no yardstick by which compensatory damages for pain and mental suffering can be measured, and the ascertainment of the amount the plaintiff was due as compensation for these elements of damage must of necessity be left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise." W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 603, 165 So.2d 375 (1963). It was a "just and reasonable inference" for the jury to conclude that Terry Chandler lived for a "perceptible duration of time" after the contamination and during the fire, and, therefore, Industrial Chemical's motion for JNOV was properly denied.

*821 IV
The final issue is whether the trial court erred in failing to state in the record its reasons for refusing to interfere with the jury verdict on grounds of excessiveness of the damages. In discharging our role of appellate review of trial court action in either granting or refusing to grant a new trial where remittitur is granted or denied, we require the trial court to reflect in the record its reasons for interfering with the jury verdict or for refusing to do so. Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). We emphasize again, however, "that only where the record establishes that the award is excessive or inadequate as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur." Hammond, 493 So.2d at 1379.
Industrial Chemical asserts on appeal that a review of the evidence in light of the total damages award indicates that the jury disregarded the trial court's instructions and produced an award on Lynn Chandler's breach of warranty claim so excessive as to be "a total failure of justice," and that "there were many improper factors contributing to the excessiveness of the jury's verdicts." Chandler and Ensley assert that there is no evidence to indicate that the jury's verdict was based on bias or prejudice. These are matters for the trial court's consideration, and on this ground the cause is remanded with directions to the trial court to enter an order consistent with Hammond v. City of Gadsden, supra, and with this opinion. The trial court shall report its findings, with or without an additional hearing, within 28 days of the issuance of this opinion.
Therefore, the imposition of liability is affirmed, but the cause is remanded with directions to consider the question of excessiveness of damages.
AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.
ALMON, SHORES, BEATTY and STEAGALL, JJ., concur.
TORBERT, C.J., and JONES, J., concur specially.
HOUSTON, J., concurs in the result.
MADDOX, J., concurs in part and dissents in part.
TORBERT, Chief Justice (concurring specially).
I write specially to point out that the discussion in footnote 1 of the majority opinion is unnecessary to the resolution of the case and is probably too broad.
JONES, Justice (concurring specially).
On the authority of Benefield v. Aquaslide `N' Dive Corp., 406 So.2d 873 (Ala. 1981), and Geohagen v. General Motors Corp., 291 Ala. 167, 279 So.2d 436 (1973), I am constrained to concur in the judgments of affirmance in these two cases. I write separately to reiterate my longstanding disagreement with the holdings of those two cases, on which these affirmances are in part premised. (I concur in Justice Houston's concurring opinion. The thoughts expressed here apply with equal force to the issue addressed by him.)
I dissented in Geohagen and concurred specially in Aquaslide, but only because I did not have four additional votes to overturn Geohagen. It seemed to me then and I have not changed my mind since that Geohagen reduced the rule of law to a level of silliness in declaring that one who is killed through the misconduct or default of another must die ex delicto or else forgo, for his estate, the right to fix civil liability on the culpable party.
Geohagen`s rationalethat breach of warranty is not a "wrongful act" or an "omission," as those terms are used in the wrongful death statuteis fundamentally flawed. The Geohagen Court forgot that the remedy for breach of warranty had its inception in the common law as an ex delicto action. Furthermore, the notion that breach of warranty is something other than a "wrongful act" or an "omission" is curious reasoning. The opposite of "wrongful" is "rightful"; and one who claims breach of warranty does not allege and *822 seek to prove a rightful act on the part of the defaulting party. See my dissenting opinion in Geohagen, 291 Ala. at 176, 279 So.2d at 444.
It is the ultimate irony that the "breach of contract" remedy is barred only if the injured party is mortally wounded: Warranty law recognizes an ex contractu right of redress for the culpable conduct of another only if the injured party survives the injury; i.e., one may live ex contractu, but he can die only ex delicto. The only other case I can think of that subjects the law to such ridicule is Slagle v. Parker, 370 So.2d 947 (Ala.1979), appeal dismissed, 444 U.S. 804, 100 S.Ct. 24, 62 L.Ed.2d 17 (1980), in which the Court held that an injured employee must live in order to preserve the third-party ex delicto remedy against a coemployee allowed by Ala.Code 1975, § 25-5-11. In what had to be one of its lowest moments, the law declared that it was cheaper to kill than to injure.
Bad decisions are rarely without reproductive potential. Unfortunately, their illegitimate offspring live and likewise pass on the evil genes of their bad progenitors. When Geohagen barred "breach of contract" recovery for wrongful death, it necessarily and inextricably invoked the statutory survivability of causes of action ex contractu. Code 1975, § 6-5-462. This, in turn, produced the inevitable advent of Aquaslide, whose unwitting effect was to overrule the concept of a single recovery for wrongful death. Parker v. Fies & Sons, 243 Ala. 348, 10 So.2d 13 (1942). Geohagen`s misguided reasoning laid the premise for Aquaslide`s errant holding that, where appropriate, compensatory damages are recoverable in contract from the moment of injury to the moment of death and additional punitive damages are recoverable for tortious, "wrongful" death. The instant case brings us full circle: In breach of warranty cases involving an injured party who dies, but not instantly, we have now substituted the double recovery doctrine for the single recovery doctrine of Parker. See, also, Woodward Iron Co. v. Craig, 256 Ala. 37, 53 So.2d 586 (1951).
On the one hand, my dissent in Geohagen was viewed by the majority as being too liberal, in favor of allowing the ex contractu action for wrongful death. On the other hand, my special concurrence in Aquaslide was thought to be a conservative approach, against allowing recovery under both ex contractu and ex delicto actions and thus inconsistent with my dissent in Geohagen. To the contrary, my separate positions in the two cases are totally consistent and defy philosophical labels, for both positions are based on the same fundamental concepts: that the personal representative of one who suffers death at the culpable hands of another, whether the breach of duty gives rise to a cause of action ordinarily characterized as ex contractu or a cause of action ordinarily characterized as ex delicto, or both, is entitled to a single right of redressa claim pursuant to the wrongful death statute.
Traditional legal principles, faithfully and consistently applied, are no respecters of partisan results. Applied within the framework of the rule of law, fundamental, traditional principles seek only to achieve a reasonable degree of stability and a fair and just disposition of the controversy. While stability is a justifiable aim of precedential jurisprudence, the decision-making process must never content itself with the notion that it is better that the law be stable than that it be right; rather, the system must find its justification in pursuit of the right, for only through its application of time-tested truthsthe law's evenhanded equalizercan it fairly and justly adjudicate the conflicting interests of the litigants.[1]
In the Law's pursuit of truth, even classic legal propositions, unless constitutionally based, are seldom sacrosanct. (Constitutionally vested rights and obligations fall within a more restrictive standard of scrutiny because their organic premise rests not *823 on any ordinary public interest, but on a supreme public necessity.) Within the common law tradition, there is no such thing as the arrogance of the doctrine of inerrancy. Indeed, undue bondage to the servitude of stare decisis stands in sharp contrast to the time-honored role of the common law as a process, not as a static condition. In the search for ultimate justice, continuing inquiry and correction are essential. Time, with its new experiences and evolving social standards, may expose the fallacy of rigidly applying once-held "truisms."[2]
Admittedly, integrity and common sensethe polestars of an enduring judicial systemmust never be sacrificed on the altar of antiquity; yet, so long as traditional values withstand the acid test of such scrutiny, those basic tenets that represent the wisdom of the ages should not be recklessly abandoned or carelessly misapplied in order to achieve result-oriented partisan ends. Geohagen`s rationale and its resultant holding fell short of the requisite scrutiny and, thus, in turn, sired the errant holding in Aquaslide.
This is not to suggest that judicial decision-making is a mechanical process, which, if properly executed, leaves no room for disagreement among the decision makers with respect to the result. To be sure, a substantial portion of all appeals presents what may be classified as "policy call" issues, in which the application of commonly recognized legal principles invokes competing public policy considerations. In such cases, the collegiate decision-making process finds its wisdom and strength in honest and legitimate disagreement; and substantive and remedial jurisprudence rarely suffer, whichever philosophical position prevails.
"Policy call" cases, generally speaking, are readily distinguishable from those cases, like these two, in which the dispositive issue invokes the application of longstanding, uncontested legal concepts without the interplay of competing philosophical or policy considerations. In those latter cases, the credibility of the decisionmaking process and the resultant jurisprudence are impugned when the decisionmaking process replaces classic analysis with pragmatic expedience, thus rejecting basic principles with which to fashion, from the adversarial positions of the parties, a viable vehicle for decision.
I am keenly aware, of course, that, presently, mine is a voice crying in the wilderness. Indeed, Geohagen is not even cited in the majority opinion. Thus, my plea for reconsideration of Geohagen and its natural progeny, Aquaslide, falls on less than attentive ears. Almost invariably, as the instant cases so clearly demonstrate, a fundamental legal principle, once it leaves the main track, does not run on a track parallel to its original course; rather, it runs at an angle away from its point of departure; and the more the principle is erroneously applied, the more divergent the tracks become.
In conclusion, I accept the practical wisdom of the proposition that the judgments in these two cases should not be overturned by overruling the very precedents on which they were tried. Nonetheless, I had hoped that the facts of these cases would dramatize the need to restore, for prospective application, the "wisdom of the ages" that was improvidently ignored in Geohagen and not relearned in Aquaslide. That my perception of the law will someday be the law of this State I have no doubt. However belatedly, fundamental, classic legal principles, though temporarily forsaken, will eventually find their way home. But, for now, they must await another day.
HOUSTON, J., concurs.
HOUSTON, Justice (concurring in the result).
I concur in the result and summarize part of my dissent in Tatum v. Schering Corp., 523 So.2d 1042, 1047-1063 (Ala. 1988).
*824 If a plaintiff is injured as a result of the wrongful act, omission, or negligence of another, the plaintiff is entitled to full compensation for all injuries proximately caused by such wrongful act, omission, or negligence. The interest of the victim must always be kept foremost in mind in dealing with compensatory damages.
Punitive damages are not to compensate a victim for loss, but to punish and deter the defendant. When considering punitive damages, there is no amount to which a victim is entitled, and there is no need for giving anyone maximum assurance that a certain amount will be recovered. In assessing punitive damages, the defendant's right to fair punishment must be paramount to giving a plaintiff maximum assurance that the plaintiff will receive a certain amount of punitive damages.
The concept for damages for wrongful death in Alabama is a paradox. We label the damages punitive in their purpose to achieve the Wrongful Death Statute's goal of preserving human life. Yet, there can be, and frequently is, an uncompensated victim and an amount that would constitute full compensation in wrongful death cases. Alabama Pattern Jury Instructions: Civil, instruction 11.18, which the Court recommended that trial judges in this State use, without prejudice to the rights of any litigant to make and reserve for review an objection thereto as to substance (Alabama Pattern Jury Instructions: Civil, page X (order) and page 161 (instruction), provides that damages for death caused by wrongful act, omission, or negligence causing death are "punitive," "entirely punitive," and should be "directly related to the amount of wrongdoing on the part of the defendant(s)." "The jury is to be instructed that it is not to consider the (pecuniary) (monetary) value of the life of the decedent" because the damages are not to "compensate the family of the deceased from a (pecuniary) (monetary) standpoint... nor to compensate the plaintiff for any financial or pecuniary loss ... or the family of the deceased on account of (his) (her) death."
I interpret the Wrongful Death Statute as primarily intending to afford compensation to the next of kin of a person coming to his or her death through the wrongful act, omission, or negligence of another, and to allow punitive damages only in those cases where they would have been recoverable had the injury fallen short of death. Tatum v. Schering Corp., supra, at pages 1047-1063. However, until this is changed and until juries are so instructed, I must view damages in wrongful death cases as something unique and as not punitive damages qua punitive damages.
JONES, J., concurs.
MADDOX, Justice (concurring in part and dissenting in part).
I concur in the affirmance of the judgment of the trial court, but I cannot agree with the principle of law stated in the opinion that "punitive damages awarded in a civil proceeding are not subject to the constitutional restrictions of the Eighth Amendment, which applies to criminal proceedings only."
The question of whether the Excessive Fines Clause of the Eighth Amendment applies to punitive damages awarded in a civil case has received substantial attention during the past two or three years, and it is a question that I do not believe the Supreme Court of the United States has resolved. That Court, in Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986), stated:
"Appellant also argues that the retrospective imposition of punitive damages under a new cause of action violates its rights under the Contracts Clause of Article I, Section 10; that a $3.5 million punitive damages award is impermissible under the Excessive Fines Clause of the Eighth Amendment; and that the lack of sufficient standards governing punitive damages awards in Alabama violates the Due Process Clause of the Fourteenth Amendment. In addition, appellant contends that Ala.Code § 12-22-72 (1975), under which any person who unsuccessfully appeals a money judgment is assessed a 10% penalty, is unconstitutional *825 under the Equal Protection Clause of the Fourteenth Amendment. These arguments raise important issues, which, in an appropriate setting, must be resolved; however, our disposition of the recusal-for-bias issue makes it unnecessary to reach them."
(Emphasis added.)
I was hopeful that the Supreme Court of the United States would address the question in Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), but it did not. The Supreme Court now has before it the case of Colonial Pipeline Co. v. Brown, 258 Ga. 115, 365 S.E.2d 827 (1988), in which the Georgia Supreme Court held that the Excessive Fines Clause of the Georgia Constitution "applies to the imposition of punitive damages in civil cases because, `the purpose of the deprivation is among those ordinarily associated with punishment, such as retribution, rehabilitation, or deterrence[,] Ingraham [v. Wright ], supra, 430 U.S. at 687-88, 97 S.Ct. at 1420-21 (White, J., dissenting), and because the Eighth Amendment Excessive Fines Clause of the United States Constitution was intended as a protection from all excessive penalties."
In a special concurring opinion in Alabama Power Co. v. Cantrell, 507 So.2d 1295, 1308 (Ala.1986), I stated that "[m]y review of the history of the Excessive Fines Clause of the Eighth Amendment and its English antecedents convinces me that the clause may be broad enough to cover punitive damages awards in civil cases."
The Georgia Supreme Court set out in its opinion in Colonial Pipeline some of the same history of the Eighth Amendment that I had reviewed at the time I wrote my special concurrence in Alabama Power Co. v. Cantrell. Because the conclusion reached by the Georgia Supreme Court in Colonial Pipeline and the reasoning applied is consistent with my own view of the law, I set out in extenso that reasoning:
"a. Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), has been relied upon to find that the Eighth Amendment does not apply to civil cases. But, Ingraham dealt only with the cruel and unusual punishment clause of the Eighth Amendment, it did not concern the excessive fines clause. It cannot be viewed as excluding punitive damages from scrutiny under the excessive fines clause of the Eighth Amendment. Moreover, even if Ingraham had held that the Eighth Amendment of the United States Constitution applied only to criminal cases, there would be nothing to prevent the application of the excessive fines clause of Art. I, Sec. I. Par. XVII of the 1983 Georgia Constitution to civil cases, thereby affording greater protection under state law.
"Justice White writing for the dissent in Ingraham stated, `[t]he Court would have us believe ... that there is a recognized distinction between criminal and noncriminal punishment for purposes of the Eighth Amendment. This is plainly wrong.' Id., 686 [97 S.Ct. at 1420]. Justice White cited Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion), for the appropriate test: `The relevant inquiry is not whether the offense for which a punishment is inflicted has been labeled as criminal, but whether the purpose of the deprivation is among those ordinarily associated with punishment, such as retribution, rehabilitation, or deterrence.' Ingraham, supra, 430 U.S. at 686-87, 97 S.Ct. at 1420-1421 (White, J., dissenting).
"b. Punitive damages `are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.' Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997 [3012], 41 L.Ed.2d 789 (1974). In Georgia, when the tortious conduct amounts to `wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences[,]' punitive damages are allowed pursuant to OCGA § 51-12-5 to deter the wrongdoer from repeating his wrongful acts. Southern Railway Co. v. O'Bryan, 119 Ga. 147, 45 S.E. 1000 (1903); Moore v. Thompson, 255 Ga. 236, 237, 336 S.E.2d 749 (1985). Punitive *826 damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage[s] award. Southern Railway Co., supra. Punitive damages, although civil in nature, nonetheless serve the criminal law goal of deterrence rather than the traditional compensatory goal of civil law.
"c. `The applicability of the Eighth Amendment always has turned on its original meaning, as demonstrated by its historical derivation.' Ingraham, supra, 430 U.S. at 670-71 n. 39, 97 S.Ct. at 1412 n. 39. A review of the history of the excessive fines clause of the Eighth Amendment indicates that it has an origin that was not limited to criminal cases. See Jeffries, J., `A Comment on the Constitutionality of Punitive Damages', 72 Va.L.Rev. 139 (1986); Massey, C., `The Excessive Fines Clause and Punitive Damages: Some Lessons From History,' 40 Vanderbilt L.R. 1234 (1987).
"Prior to 1215 a system was developed whereby a monetary penalty was demanded from one who engaged in either criminal or civil misconduct. The penalty was called an `amercement.' The amercement was not levied according to any fixed schedule but was imposed arbitrarily at the discretion of the court. Abuses in the use of `amercement' flourished. The abuses were so pervasive that a great deal of space was devoted to them in the Magna Carta. [The Supreme Court of Georgia then quotes Jeffries, supra, at 155, who in turn quotes Magna Carta:] `[In ... ] Chapter 20 of the Great Charter, the king was made to concede that: "A freeman shall not be amerced for a slight offense, except in accordance with the degree of the offense; and for a grave offense he shall be amerced in accordance with the gravity of the offense, yet saving always his `contenement'; and a merchant in the same way, saving his `merchandise'; and a villein shall be amerced in the same way, saving his `wainage'if they have fallen into our mercy; and none of the aforesaid amercements shall be imposed except by the oath of honest men of the neighbourhood."'
"`From these three provisions of Magna Carta, two related protections emerge. First, there is a requirement of reasonableness, of proportionality, of sensible relation between punishment and offense. Second, the penalty inflicted should not, in any event, destroy the offender's means of making a living in his particular trade or calling. Magna Carta guaranteed not just bare survival, but continued productive economic viability.' Id., at 156.
"The United States Constitution as originally submitted to the states was criticized for its failure to include a declaration of rights. `Magna Carta and the English Bill of Rights were invoked as models of what was required, and a tacit understanding was reached that some such provisions would be added by way of amendment.' Id., at 156. `The Eighth Amendment was based directly on Art. I, Sec. 9, of the Virginia Declaration of Rights (1776) ... [which] in turn ... adopted verbatim the language of the English Bill of Rights. There can be no doubt that the Declaration of Rights guaranteed at least the liberties and privileges of Englishmen.' Solem v. Helm, 463 U.S. 277, 285-86 n. 10, 103 S.Ct. 3001 [3007 n. 10], 77 L.Ed.2d 637 (1982).
"d. We hold that the excessive fines clause of Art. I, Sec. I, Par. XVII of the Georgia Constitution applies to the imposition of punitive damages in civil cases because, `the purpose of the deprivation is among those ordinarily associated with punishment, such as retribution, rehabilitation, or deterrence[,]' Ingraham, supra, 430 U.S. at 687-88, 97 S.Ct. at 1420-1421 (White, J., dissenting.), and because the Eighth Amendment excessive fines clause of the United States Constitution was intended as a protection from all excessive monetary penalties.
"4. In order to decide what fines are excessive under the excessive fines clause of the Georgia Constitution, Art. I, Sec. I, Par. XVII, a look into the history of torts is necessary.
*827 "`Broadly speaking, a tort is a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.' W.L. Prosser and W.P. Keeton, Prosser & Keeton, Handbook on the Law of Torts, p. 2 (5th Ed., 1984).
"`In the early English law, after the Norman conquest, remedies for wrongs were dependent upon the issuance of writs to bring the defendant into court. In the course of the thirteenth century the principle was established that no one could bring an action in the King's common law courts without the King's writ. As a result of the jealous insistence of the nobles and others upon the prerogatives of their local courts, the number of writs which the King could issue was limited, and their forms were strictly prescribed. There were, in other words, "forms of action," and unless the plaintiff's claim could be fitted into the form of some established and recognized writ, he was without a remedy in the King's courts. The result was a highly formalized system of procedure, which governed and controlled the law as to the substance of the wrongs which might be remedied.
"`The writs which were available for remedies that were purely tortious in character were twothe writ of trespass, and the writ of trespass on the case.
"`The form of action in trespass had originally a criminal character. It would be only in cases of forcible breaches of the King's peace, and it was only on this basis that the royal courts assumed jurisdiction over the wrong. The purpose of the remedy was at first primarily that of punishment of the crime; but to this there was added later the satisfaction of the injured party's claim for redress. If the defendant was found guilty, damages were awarded to the successful plaintiff, and the defendant was imprisoned, and allowed to purchase his release by payment of a fine. What similarity remains between tort and crime is to be traced to this common beginning. See Woodbine, The Origin of the Action of Trespass (1923) 33 Yale L.J. 799, (1934) 34 Yale L.J. 343; Maitland, The Forms of Action at Common Law (1941) 65.' W.L. Prosser, Cases and Materials on Torts, p. 2 (6th ed., 1976).
"`Originally the two remedies [criminal and tort] were administered by the same court, and in the same action. Tort damages were at first awarded to the injured individual as an incident to an [sic] criminal prosecution; and as late as 1694 the defendant to a writ of trespass was still theoretically liable to a criminal fine and imprisonment. Because of this common origin, it is not unusual for a tort and a crime to bear the same name, such as "assault," "battery," "trespass," or "libel," and often enough such terms will refer to the same conduct. But tort and criminal law have developed along different lines, with different ends in view, and so it does not necessarily follow that the term has the same meaning in both. Thus it is entirely possible that an act may be a tort, but not a crime of the same name, or that it may amount to the crime and not the tort....
"`The idea of punishment, or of discouraging other offenses, usually does not enter into tort law, except in so far as it may lead the courts to weight the scales somewhat in favor of the plaintiff's interests in determining that a tort has been committed in the first place. In one rather anomalous respect, however, the ideas underlying the criminal law have invaded the field of torts. Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages, or what is sometimes called "smart money." Such damages are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example....
*828 "`Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as "gross," in a term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched to include the element of conscious indifference to consequences, and so to justify punitive damages. Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort.
"`Typical of the torts for which such damages may be awarded are assault and battery, libel and slander, deceit, seduction, alienation of affections, malicious prosecution, and intentional interferences with property such as trespass, private nuisance, and conversion. But it is not so much the particular tort committed as the defendant's motives and conduct in committing it which will be important as the basis of the award.' W.L. Prosser and W.P. Keeton, supra, pp. 8-11. (Citations omitted and emphasis supplied.)
"Thus it can be seen that the tort law grew out of the criminal law and as such retains some of the elements thereof, to-wit, punitive damages. The word punitive means to inflict punishment."
258 Ga. at 118-22, 365 S.E.2d at 831-32.
In North Carolina Mutual Life Ins. Co. v. Holley, 533 So.2d 497 (Ala.1988), I also set forth some reasons why I am of the opinion that the Excessive Fines Clause of the Eighth Amendment does apply to punitive damages awards in civil cases.
Although the Supreme Court of the United States did not consider the constitutional claim in the Bankers Life case, it is interesting what the Court opined:
"In determining whether to exercise jurisdiction over questions not properly raised below, the Court has focused on the policies that animate the `not pressed or passed upon below' rule. These policies are first, comity to the States, and second, a constellation of practical consideration, chief among which is our own need for a properly developed record on appeal. See Webb v. Webb, supra, 451 U.S. [493], at 500-501, 101 S.Ct. [1889], at 1893-1894 [68 L.Ed.2d 392 (1981) ]. Because the chief issue appellant would have us resolvewhether the Eighth Amendment's Excessive Fines Clause serves to limit punitive damages in state civil casesis a question of some moment and difficulty, these policies apply with special force. See Illinois v. Gates, supra, 462 U.S. [213], at 224, 103 S.Ct. [2317], at 2325 [76 L.Ed.2d 527 (1983) ] (`Where difficult issues of great public importance are involved, there are strong reasons to adhere scrupulously to the customary limitations on our discretion'); Mishkin v. New York, 383 U.S. [502], at 512-513, 86 S.Ct. [958], at 965 [16 L.Ed.2d 56 (1966) ] (`The far-reaching and important questions tendered by this claim are not presented by the record with sufficient clarity to require or justify their decision'). Our review of appellant's claim now would short-circuit a number of less intrusive, and possibly more appropriate, resolutions: the Mississippi State Legislature might choose to enact legislation addressing punitive damages awards for bad-faith refusal to pay insurance claims; failing that, the Mississippi state courts may choose to resolve the issue by relying on the state constitution or on some other adequate and independent nonfederal ground; and failing that, the Mississippi Supreme Court will have its opportunity to decide the question of federal law in the first instance, while any ultimate review of the question that we might undertake will gain the benefit of a well-developed record and a reasoned opinion on the merits. We think it unwise to foreclose *829 these possibilities, and therefore decline to address appellant's challenges to the size of the punitive damage[s] award."
486 U.S. at ___, 108 S.Ct. at 1651, 100 L.Ed.2d at 72-73.
In footnote 5, 486 U.S. at ___, 108 S.Ct. at 1651, the Court noted that several states had enacted limits on punitive damages in specified types of action, indicating to me that the Court very well could allow the various states to determine the size and nature of penalties in civil cases.
Like the Georgia court, I am of the opinion that the Excessive Fines Clauses of both the Alabama and federal constitutions apply in civil cases; consequently, I dissent as to that aspect of the case.
Nevertheless, I do not find that the award in this case is excessive. In Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1986), a civil action for wrongful death, the jury awarded the plaintiff $3.5 million. There, in my special concurrence, I stated that I was of the opinion that "a claim that a verdict is excessive in a death case must be viewed differently than in other cases where punitive damages are awarded." I also noted that "[t]he legislature just recently made a distinction between wrongful death actions and other civil actions in which punitive damages are recoverable." I cited Act 87-185, Ala. Acts 1987, and pointed out that the legislature specifically provided that death actions would not be affected by certain provisions of that act.
Because this is a death action, and because the only damages recoverable are punitive in nature, I agree that the judgment appealed from is due to be affirmed.

AFTER REMAND
ADAMS, Justice.
Industrial Chemical and Fiberglass Corporation, a distributor of fiberglass products and supplies, appealed from a judgment based upon a jury verdict awarding Lynn B. Chandler and Peggy Ann Ensley $2.5 million each on their claims against Industrial Chemical after their husbands, Terry D. Chandler and Dewey E. Ensley, Jr., were killed by a chemical fire that swept through a cylindrical fiberglass tank in which the men were working.
In our first opinion in this case (September 30, 1988), we held that the punitive damages award against Industrial Chemical did not violate its rights under the Eighth Amendment to the United States Constitution and that Lynn Chandler and Peggy Ann Ensley had capacity to assert claims for Industrial Chemical's breach of implied warranty. Remand was had to the trial court, however, for the entering of an order required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), in which the trial court was to state in the record its reasons for refusing to interfere with the jury verdict on grounds of excessiveness of the damages.

I.
Following the decision in Hammond, the trial court amended its previous order denying Industrial Chemical's motion for new trial or remittitur, to state:
"The Alabama Supreme Court set forth in the Hammond decision the criteria to be used by trial courts in granting or denying a remittitur. The verdicts in the present cases fall within that class of cases in which there is no exact standard or rule of law which makes the damages legally and mathematically ascertainable at a precise figure. The appropriate standard for review of such a verdict is whether or not the verdict resulted, not from the evidence and applicable law, but from bias, passion, prejudice, corruption or other improper motive. In deciding whether a jury verdict is so flawed, the trial [court] cannot substitute its own judgment for that of the jury, and the jury verdict is not to be set aside unless it is flawed so as to lose its constitutional protection under Article 1, Section 11, Constitution of 1901.
"In determining whether or not the verdicts in these cases were the result of bias, passion, corruption, or improper motive, it is appropriate to look back to the trial proceedings to determine whether or not any incidents occurred either in *830 the courtroom or outside the courtroom which could have arguably resulted in the verdicts being based upon some improper motive. The present cases were tried wholly without incident and therefore the motives of the jury cannot in any way be attributed to such factors. No incidents were brought to the court's attention of any improper conduct of the jury, of the attorneys, of the parties, or that any other extraneous factors could have occurred which would have improperly affected the verdicts in these cases.
"Additional factors to be considered by the trial court were set out in the Hammond decision: `The culpability of the defendant's conduct, Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala.1981); the desirability of discouraging others from similar conduct, Ford Motor Credit Co. v. Washington, 420 So.2d 14 (Ala.1982); the impact upon the parties, Alabama Power Co. v. Hussey, 291 Ala. 586, 285 So.2d 92 (1973).' When each of these factors [is] considered, the verdicts in these cases are due to be upheld.
"The enormity of the wrong committed by the defendant was the death of Eddie Ensley and Terry Chandler. Industrial Chemical's culpability was established by its failure to provide warnings and material data sheets on the use and dangerous propensities of MEKP, a highly volatile chemical. Contrary to Industrial Chemical's argument that their conduct was of a low degree of culpability, the evidence at trial demonstrated that Industrial Chemical's conduct was extremely culpable. Additionally, the verdicts against Industrial Chemical will speak to the industry as a whole and will serve to deter similar conduct in the future.
"The enormity of the wrong and the necessity of preventing similar conduct in the future is further strengthened when the role of Industrial Chemical in distributing a hazardous product is considered. The vital role occupied by Industrial Chemical and Fiberglass Corporation and other distributors of products in our society was pointed out to the jury during the trial of these cases. Few manufacturers of dangerous products deal directly with the customers, the end users. The manufacturers seldom know or have the means of determining who the customer is, his experience with the product, his knowledge of the dangers in the use of the product, or exactly what situation in which the product will be used. However, distributors like Industrial Chemical are in a position to know these facts and to take appropriate steps so that the end user will not be harmed by the product.
"Finally, with regard to the impact of these verdicts on the defendant, it should be noted that Industrial Chemical & Fiberglass Corp. is fully insured against these verdicts by the Hartford Accident & Indemnity Company. Pursuant to this coverage a supersedeas bond has been filed in this appeal on behalf of Industrial Chemical.
"The size of the wrongful death verdicts in these actions is not such as to create any inference of bias or prejudice on the part of the jury. The case of George Scherer, as Administrator of the Estate of Wanda Scherer v. Penn Mutual Life Insurance Company, et al., was settled in this court in 1985 for $2,000,000.00. That case involved a single death under circumstances not more culpable than those presented in these cases. Obviously, a number of the finest defense counsel were of the opinion that a jury could return a verdict in a death case substantially in excess of $2,000,000.00 and yet still be a reasonable verdict.
"Turning now to the compensatory damages aspect of these verdicts, again it should be pointed out that these verdicts fall within that class of cases in which there is no exact standard or rule of law which makes the damages legally and mathematically ascertainable at a precise figure. The compensatory aspect of these verdicts must have been due to passion, bias, corruption, or improper motive in order for remittitur to be appropriate.

*831 "The court finds no evidence that the compensatory damages portion of these verdicts was due to passion, bias, corruption, or other improper motive. Terry Chandler and Eddie Ensley were working in the tank together when the fire broke out. Eddie Ensley escaped from the tank and died eighteen days later. Terry Chandler was pronounced dead inside the tank.
"Terry Chandler's pain, suffering and mental anguish prior to his death were of the highest order of intensity. Michael Patterson during his testimony related the horrible events surrounding the fire and Terry Chandler's death. The frantic efforts to put out the fire, the chaotic escape attempt from the tank, Terry Chandler's screams and the silenceall of these attest to the magnitude of Terry Chandler's pain, suffering, and mental anguish prior to his death.
"Eddie Ensley, also horribly burned, lived for eighteen days after the fire. Although one might argue that his pain and suffering extended over a longer period of time than did Terry Chandler's, Eddie Ensley was also able to enjoy some family comfort and some hope that he might recover from his injuries. The amount awarded on the breach of warranty claims in these cases is not shocking to the conscience and there is no evidence of bias or prejudice on the part of the jury in rendering its verdict."

II.
Industrial Chemical argues, first, that its degree of culpability is not proportionate to the degree of punishment (i.e., the amounts of the verdicts) because, it says, it was not guilty of deliberate or intentional conduct and the verdicts are not "appropriate for deaths resulting from simple negligence"; second, that instead of deterring wrongful conduct, the verdicts will "discourage others from doing business"; and, third, that because the "exorbitant verdicts in these cases will serve to make the cost of [hazardous products] insurance more costly and perhaps prohibitively costly" for it, the impact of the verdicts may be "fatal" to Industrial Chemical's "continued existence."

A
It has long been held that the amount of care required by the standard of reasonable conduct is commensurate with the apparent risk or danger. McClusky v. Duncan, 216 Ala. 388, 113 So. 250 (1927). Thus, as the danger becomes greater, the actor is required to exercise caution commensurate with itthose who deal with dangerous instrumentalities, such as explosives or chemicals, must exercise a great amount of care because the risk is great. "They may be required to take every reasonable precaution suggested by experience or prudence." W. Keeton, Prosser and Keeton on Torts (5th ed. 1984).
To reduce Industrial Chemical's failure to warn to "simple negligence" as to which the verdicts are not "appropriate" is fantasy in light of testimony regarding the danger and volatility of MEKP. Industrial Chemical was required to take "every reasonable precaution" suggested by its experience with this chemical (and its experience was, by its own admission, extensive, it having sold more than 2,500,000 gallons of MEKP between 1964 and 1985), and its failure to take the most basic precaution of providing the material safety data sheet and technical bulletin suggests an extraordinary degree of fault in the resulting accident. Industrial Chemical's culpability, as reflected in the verdicts, is beyond question.

B
The desirability of discouraging similar conduct calls for a balance between the severity of the conduct and society's interest in preventing a recurrence of the conduct. Thus, the greater the severity of the conduct, the greater society's interest in preventing recurrence. The trial court's order stated that Industrial Chemical's position as a distributor of dangerous products placed it in a unique posture with regard to the end users of the products. In this unique posture, with Industrial Chemical having the responsibility to provide appropriate and adequate warnings as *832 to usage and safety, its failure to do so is conduct of great severity. Consequently, society's interest in preventing a recurrence of this negligent distribution of dangerous chemicals and products is great, and we cannot say that the trial court erred in its consideration and evaluation of the jury's verdicts as appropriate and desirable for discouraging similar conduct.

C
Industrial Chemical argues that the impact of the awards will "unquestionably be adverse and perhaps even fatal to its continued existence," and that a "lower award would serve to allay such dire consequences while still serving as a deterrent for similar conduct in the future." Thus, in other words, Industrial Chemical argues that the awards may be large enough to destroy the company. It is this issue, whether the awards should hurt or destroy, that troubles trial and appellate courts faced with a jury's award of substantial punitive damages for a wrong.
Justice Jones recognized and addressed this dilemma in his special concurrence in Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala.1981):
"We are all in agreement that the award in the instant case ought to be large enough to hurt. It ought to sting in order to deter; this is its purpose. But only in the rarest of cases should it be large enough to destroy; this is not its purpose.
"... I can readily agree that the gravity of the wrong, abundantly supported by the proof of record, justifies the full amount of this award; and, this being the sole cognizable standard, I am constrained to concur in the Per Curiam affirmance. But, still, in my opinion, something is missing; this standard is deficient. To the `gravity of the wrong' element should be added this inquiry: What (i.e., how much) will it take to punish this Defendant? The purpose of this two-fold test is to particularize both the wrongful act and the wrongdoer. Only when both elementsthe gravity of the wrongful act and the amount of damages necessary to punish the particular defendantare considered and weighed one against the other, can the award be rationally adjudged to accomplish the ultimate purpose of exemplary damages."
Ridout's-Brown Service, Inc., supra, at 127.
Justice Jones isolated the problem caused by the difficulty of injecting the question of the adequacy of the damages into the proceedings without impermissibly impugning the factfinding process regarding liability (evidence of the defendant's financial worth being inadmissible). His suggestion was to permit the adequacy of the damages to be examined in a post-judgment proceeding by way of judicial review, with the hope of arriving at an amount proportional to its intended purpose, to fit the punishment to the offensive conduct and the offender.
This is the logical conclusion of Hammond. Any number of factors are appropriate for the trial court's consideration when deciding whether to interfere with a jury verdict on grounds of excessiveness of the damages, and the impact on the parties is best fixed by post-judgment review of financial worth. Protection is then afforded both the plaintiff, whose right to a reliable factfinding process is not sacrificed, and the defendant, whose right to a fair punishment is not diminished. In this case, however, we note that Industrial Chemical did not provide either the trial court or this Court with financial data evidencing and supporting its statement that it would face imminent financial destruction if the awards are allowed to stand.
The trial court did take notice of the obligation of Industrial Chemical's insurer to indemnify it to a fixed amount, and, obviously, considered the impact upon Industrial Chemical for its liability above and beyond the indemnification point. And we cannot say, upon complete review of the record, that the trial court erred in its determination. In fitting the punishment to the offender, we have already taken notice of the gravity of Industrial Chemical's conduct; and, notwithstanding the absence of proof of Industrial Chemical's financial worth, we believe that the punishment *833 is not out of proportion to its intended purpose.
Therefore, following review of the record and the briefs, and oral argument in this case, we believe that the trial court's order accurately reflects those considerations mandated by Hammond v. City of Gadsden and its progeny. Consequently, we hold that the record does not establish that the awards are excessive as a matter of law, and it is not established or reflected in the record that the verdicts are based upon bias, passion, corruption, or other improper motive. We reaffirm the substantial rules of law that a trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; that a trial court may not substitute its judgment for that of the jury; and that there can be no ironclad rule in considering the adequacy or excessiveness of a verdict. Each case must be determined by its own facts and on its own merits. Hammond, supra, at 1379.

III.
Last, Industrial Chemical argues that the compensatory awards for pain and suffering are excessive: to paraphrase Industrial Chemical, Dewey E. Ensley survived for only 18 days after the fire, which is "relatively short given the years of pain and suffering which victims of other accidents must endure"; and Terry Chandler's award is "even less justified" because he "suffered for only a few seconds before he perished." These arguments raise the difficult question of assessing damages for something that can be felt but not reduced to a balance sheet. We note that Industrial Chemical never introduced a per diem or other mathematical formula to guide the jury in its calculation of the appropriate damages of pain and suffering (with proper cautionary instructions from the trial court). Thus, the jury, guided only by its collective conscience and discretion and the testimony of witnesses for all parties, obviously felt that the degree of Dewey Ensley's and Terry Chandler's pain and suffering was real enough to demand the legal recognition in compensatory damages which it gave. Industrial Chemical has presented no error, except its argument of excessiveness, to impugn the award of compensatory damages, and, finding none, we will not interfere with the verdicts.
AFFIRMED AS TO DAMAGES.
TORBERT, C.J., and JONES, ALMON, SHORES, BEATTY and STEAGALL, JJ., concur.
HOUSTON, J., concurs in the result.
MADDOX, J., concurs in part and dissents in part.
MADDOX, Justice (concurring in part and dissenting in part).
I agree that the judgment awarding $2.5 million in punitive damages is not excessive in this case because this case involves a wrongful death, and, as I spelled out in my special concurrence before this cause was remanded, I think damages recoverable for a wrongful death, which are held to be punitive in nature, not compensatory, are in a different category, and that the Legislature has recognized that damages for wrongful death can be classified differently. In Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927), the Supreme Court of the United States rejected the defendant corporation's argument that Alabama's wrongful death act was unconstitutional because it permitted a jury to assess punitive damages against a corporation for the mere negligence of its employee. The Court, after discussing the genesis of wrongful death actions, concluded: "We cannot say that it is beyond the power of a legislature, in effecting such a change in common law rules, to attempt to preserve human life by making homicide expensive." (Emphasis added.) 274 U.S. at 116, 47 S.Ct. at 510.
I am still somewhat concerned that juries are not given more guidelines in fixing such awards, but our remand of these cases to the trial court with directions to review the verdicts in light of specific guidelines, I believe, guarantees that the ultimate judgment will not be the product of a standardless discretion.
*834 I cannot agree, however, that punitive damages awards in civil cases are not within the prohibition of the excessive fines clause of both our state and federal constitutions. I think they are. See my original concurrence in this case (September 30, 1988).

ON APPLICATION FOR REHEARING AND APPLICATION FOR STAY
ADAMS, Justice.
Industrial Chemical and Fiberglass Corporation, a distributor of fiberglass products and supplies, appealed from judgments based upon a jury verdict awarding Lynn B. Chandler and Peggy Ann Ensley $2.5 million each on their claims against Industrial Chemical after their husbands, Terry D. Chandler and Dewey E. Ensley, Jr., were killed by a chemical fire that swept through a cylindrical fiberglass tank in which the men were working.
In our first opinion in this case (September 30, 1988), we held that the punitive damages award against Industrial Chemical did not violate its rights under the Eighth Amendment to the United States Constitution and that Lynn Chandler and Peggy Ann Ensley had capacity to assert claims for Industrial Chemical's breach of implied warranty. Our second opinion (January 16, 1989), after remand for an order required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), held that the record did not establish that the awards were excessive as a matter of law, that it was not established or reflected in the record that the verdicts were based upon bias, passion, corruption or other improper motive, and that the compensatory damages awarded for pain and suffering were not excessive.
On rehearing, Industrial Chemical argues (1) that we should stay our decision pending the United States Supreme Court's decision reviewing Kelco Disposal, Inc. v. Browning-Ferris Indus., 845 F.2d 404 (2d Cir.), cert. granted, ___ U.S. ___, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988), argued en banc, April 18, 1989; (2) that our decision contradicts our traditional interpretation of the wrongful death act; (3) that we should reconsider our determination that the punitive damages awarded in these cases are not sufficiently analogous to criminal punishments to warrant application of the Eighth Amendment; and (4) that we failed to address its argument that the lack of standards for judges and juries to follow in imposing punitive damages under Alabama's wrongful death statute violated its rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

I
Industrial Chemical argues that by granting a stay of the judgments in these cases, "the Court would relieve Industrial Chemical of the unnecessary burden of petitioning the Supreme Court for a writ of certiorari on the Eighth Amendment issue" and "similarly, by granting a stay, this Court would relieve the plaintiffs of the unnecessary burden of having to file with the Supreme Court a brief in opposition to the petition." Thus, Industrial Chemical submits that this Court could "save valuable judicial time and resources" by granting a stay pending the Supreme Court's decision in Kelco Disposal, Inc. v. Browning-Ferris Indus., supra. Our holdings were based, however, on a thorough review of applicable case law and the application in Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), and Electro Services, Inc. v. Exide Corp., 847 F.2d 1524 (11th Cir.1988), to the facts before us. Ingraham and Electro Services remain precedent, and, consequently, Industrial Chemical's convenience notwithstanding, we refuse to stay the judgments.[1]

II
Industrial Chemical submits that our decision contradicts our traditional interpretation of the wrongful death act, and that we should reconsider our holding that the punitive damages awarded in these cases are *835 not sufficiently analogous to criminal punishments to warrant application of the Eighth Amendment. These arguments were, however, addressed in full in our first opinion, and Industrial Chemical raises no controlling matter of law or fact that was overlooked or not disposed of in that opinion. Consequently, we decline to reconsider our holdings that punitive damages awarded in a civil proceeding are not subject to the constitutional restrictions of the Eighth Amendment, and that the wrongful death act is not penal in effect and is not of that class of cases sufficiently analogous to criminal punishments in which they are administered to justify application of the Eighth Amendment.

III
The final issue for review on rehearing is Industrial Chemical's assertion that we failed in our opinion to address its argument that the lack of standards for judges and juries to follow in imposing punitive damages under Alabama's wrongful death act violates its rights under the Due Process Clause of the Fourteenth Amendment.
"As the Supreme Court has repeatedly made clear, the content of due process is not limited to the specific provisions of the Bill of Rights. Nor is due process confined to criminal prosecutions; it applies to any legal proceeding or regimen by which any person may be deprived of `life, liberty, or property.' Due process requires, in whatever context, that legal procedures be consistent with `fundamental fairness'; that they be consonant with `ordinary notions of fair play and the settled rules of law'; that they accord with `traditional notions of fair play and substantial justice'; and that they not offend `the community's sense of fair play and decency.' However phrased, the message is clear: due process mandates at all times, in all circumstances, and for all defendants, `fundamental fairness' at the hands of the law."
J. Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va.L. Rev. 139, 151-52 (1986). (Citations omitted.) The command of due process in the context of punitive damages requires, however, a balance between the due process rights of both the plaintiff and the defendant.

A
Our cases have long held that evidence of the defendant's wealth, or lack of wealth, is highly prejudicial and, therefore, inadmissible (and our cases recognize no distinction between situations involving compensatory damages and those involving punitive damages):
"In Ware (v. Cartledge, 24 Ala. 622, 60 Am.Dec. 489 (1854)), the plaintiff was permitted to prove, over objection, that the defendant possessed property valued at $20,000. Reversing the trial court, this court said that if wealth of a defendant is permitted then common justice requires a converse rule to prevail in the case of poor defendants. Justice Ligon wrote that common sense revolts at the adoption of such a rule. `For sad would be the fate of that country, whose laws conceded to the insolvent bully, seducer, or slanderer, the privilege of perpetrating his wrongs with comparative impunity, under assurance that, when sued for his practices, the damages would be graduated to his present ability to pay them, and consequently would be merely nominal. No sound principle of law tolerates such a practice.' (Citing cases.) Not only have our cases held that the wealth of a defendant is not admissible, but [they] also have held inadmissible the poverty of a plaintiff. In Pool [v. Devers, 30 Ala. 672 (1857),] this court said that a plaintiff's being poor is not a legitimate matter for the consideration of the jury in any point of view.
"While we recognize that other jurisdictions do permit the introduction into evidence [of] the wealth of a defendant, we adhere to our rule of excluding evidence of wealth of the defendant. Even though the rule was announced by this court in 1854, we opine that it is sound todayand for the same reason. Liability for damages cannot be determined by the economic condition of either *836 party. Cf. Allison v. Acton-Etheridge Coal Co., Inc., 289 Ala. 443, 268 So.2d 725 (1972)."
Southern Life & Health Ins. Co. v. Whitman, 358 So.2d 1025, 1026-27 (Ala.1978). (Emphasis added.) Consequently, evidence of financial worth cannot be introduced during the factfinding process to temper or mitigate a jury's potential award without impugning the process itself. Further, finding such evidence prejudicial and, therefore, inadmissible does not work a deprivation of the constitutional guaranty of due process: subject to the limitation that a party may not be precluded from presenting facts supporting his theory of the case, a rule of evidence constitutes due process of law if it is reasonable and affords an opportunity for defense. Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).
Dean Gamble notes that "the Alabama approach with respect to the admissibility of evidence concerning the relative wealth of the defendant is a departure from that used in other jurisdictions." C. Gamble, Alabama Law of Damages, § 37-9, at 491, n. 7 (2d ed. 1988). For example, in Florida, evidence of financial worth is admissible where punitive damages are allowable: "The purpose of the rule of evidence is to indicate to the jury [in] what amount, if any, a verdict would be proper to assess for punishment and at the same time not render the defendant bankrupt." Tallahassee Democrat, Inc. v. Pogue, 280 So.2d 512 (Fla.Dist.Ct.App.1973). Additionally, "A hundred dollar punitive liability may be sufficient punishment for a man of limited means; a hundred thousand dollar punitive liability might be inadequate for a man of great wealth. For these reasons, courts permit the plaintiff claiming punitive damages to introduce evidence showing something of the defendant's financial resources...." D. Dobbs, Handbook on the Law of Remedies, § 39, at 218-19 (1973).
Nevertheless, policy considerations are paramount in our continued adherence to that rule of evidence first announced in Ware v. Cartledge, 24 Ala. 622, 60 Am.Dec. 489 (1854). For instance, a plaintiff could show himself to be poor and the defendant to be of great wealth; the sympathies of the jury would possibly be aroused, and the punitive award would reflect the economic conditions of the parties and not the liability. Conversely, a defendant could show himself to be poor and the plaintiff to be of great wealth, and concessions would be made to the "insolvent bully ... [and] damages would be graduated to his present ability to pay them, and consequently would be merely nominal." Ware v. Cartledge, 24 Ala. at 626. Accordingly, we reaffirm our substantive rule of law that liability for damages cannot be determined by the economic condition of either party, and, therefore, we hold that "fundamental fairness" in the context of punitive damages does not require consideration of a wealth-based standard for their award prior to determining liability.
Further, the awarding of punitive damages is discretionary with the jury (Roberson v. Ammons, 477 So.2d 957 (Ala. 1985); Tallant v. Grain Mart, Inc., 432 So.2d 1251 (Ala.1983); Deaton, Inc. v. Burroughs, 456 So.2d 771 (Ala.1984); Morgan v. South Central Bell Tel. Co., 466 So.2d 107 (Ala.1985); Shiloh Const. Co. v. Mercury Const. Corp., 392 So.2d 809 (Ala. 1980); and Crum v. McGhee, 289 Ala. 244, 266 So.2d 855 (1972)), when there is a willful and malicious wrong, except for negligence in wrongful death cases:
"To authorize `punitive,' `exemplary,' or `vindictive' damages, there must be `... negligence,' meaning such an entire want of care as to raise the presumption that the person at fault is conscious of the probable consequences of his carelessness and indifferent to the danger of injury to the person or property of others. Punitive damages are allowable for a wrong maliciously perpetrated, or where the wrongful act is done knowingly, wantonly, and recklessly, under such circumstances as to indicate that the wrongdoer knew that the act would probably injure persons or property, or where the act was so grossly negligent, oppressive, or fraudulent as to amount to malice." *837 C. Gamble, Alabama Law of Damages, § 4-1 (2d ed. 1988). (Citations omitted.)
If the existence of malice, wantonness, or negligence is supported as fact by evidence in the record, "we must see no offense to the Constitution, and no deprivation of any constitutional right of [the defendant] in committing the assessment of such damages, including the amount to be allowed, to the sound discretion of the jury." Toole v. Richardson-Merrell, Inc., 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967). Malice, wantonness, and negligence cannot be found in a vacuum, and in the event that their existence as fact is not supported by evidence in the record, the defendant may remove the case or the issue from the trier of fact; see Rule 56, A.R.Civ.P., summary judgment (no genuine issue of material fact), and Rule 50 A.R.Civ.P., directed verdict and judgment notwithstanding the verdict (complete absence of proof on an issue material to the claim).[2]
Therefore, "fundamental fairness" at the hands of the law does not extend to the defendant the right to impugn the factfinding process by introducing evidence of financial condition or solvency, or by limiting the jury's discretion to award punitive damages other than by proper jury instruction, at the expense of the plaintiff's right to "fundamental fairness." Consequently, standards for judges and juries to follow in imposing punitive damages under Alabama's wrongful death act to meet the command of due process must exist in post-judgment review of the jury's verdict.

B
Although not imposing the stigma of crime or the unique burdens of imprisonment, punitive damages nonetheless serve to place the defendant on notice that it has engaged in conduct considered intolerable by society and also serves to deter others from following the defendant's example. But in levying a punitive award, the degree or amount must be comparable to the act deserving punishment. And though the defendant has engaged in intolerable conduct, it does not surrender its right to "fair" punishment; in other words, "although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence." Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), citing Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala.1988), City Bank of Alabama v. Eskridge, 521 So.2d 931 (Ala. 1988), and Roberson v. Ammons, 477 So.2d 957 (Ala.1985). Hence, we must ask, after the return of a jury award of punitive damages, what process is due the defendant to insure that he has been provided "fundamental fairness" at the hands of the law and to insure that society's goals of punishment and deterrence have been accomplished?
*838 "If a defendant is dissatisfied with a jury's verdict, and feels that it is excessive, or otherwise flawed, he is entitled to the protection of a variety of safeguards. The defendant may move for remittitur and a new trial in the trial court, and may appeal as a matter of right from the denial of either. He is entitled to a de novo review of the jury's verdict on appeal [Code 1975, § 12-22-71]. The appellate courts in this state have the authority to order a new trial due to the excessiveness of the verdict, to conditionally order a new trial unless the plaintiff accepts a remittitur [United Services Auto. Ass'n v. Wade, 544 So.2d 906 (Ala.1989) ], and to order the trial court to conditionally order a new trial unless the plaintiff accepts a remittitur [Gulf Atl. Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981) ].
"If a defendant properly moves the trial court to do so, the trial court is obligated to state on the record its reasons for either interfering with the jury's verdict or not interfering with it [Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) ]. And, in making the determination of whether the verdict is excessive (or inadequate), a trial court is authorized to consider the following nonexclusive list of factors:
"`"(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
"`"(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or `coverup' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
"`"(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
"`"(4) The financial position of the defendant would be relevant.
"`"(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
"`"(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
"`"(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award."'"
Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989), quoting from Green Oil Co. v. Hornsby, 539 So.2d at 223-24 (quoting in turn Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala. 1987) (Houston, J., concurring)).
From these considerations (and from those reaffirmed in Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986), emerge two related protections: First, a requirement of "reasonableness, of proportionality, of sensible relation between punishment and offense," and, second, a guarantee of "not just bare survival, but continued productive economic viability." C. Jeffries, A Comment on the Constitutionality of Punitive Damages, supra, at 156 (discussing Magna Charta's intent to curb unlimited punitive authority). Nothing prevents the defendant, at a hearing on a motion for new trial based on an allegedly flawed jury verdict,[3] from *839 presenting evidence to prove one or more of the above considerations, and, by doing so, to guarantee that his right to due process of law in regard to the jury's award is protected. In sum, "fundamental fairness" requires that the defendant be given the opportunity to present proof to the trial court during post-judgment review of the verdict that the punitive award is unreasonable, disproportionate, or economically destructive (the plaintiff, of course, is entitled to offer proof contradicting the defendant's, or, conversely, to offer proof that the award is inadequate).
Subsequently, the trial court will state for the record the factors considered in either granting or denying a motion for new trial based upon the alleged excessiveness or inadequacy of the jury's verdict, as required by Hammond v. City of Gadsden, supra. The defendant may appeal, as a matter of right, from the denial of his motion for new trial, and he is entitled to a review of the verdict on appeal, where he once again may present proof as to the excessiveness of the award. See Ala.Code 1975, § 12-22-71. We emphasize, as we did in Hammond v. City of Gadsden, that no substantive rule of law is changed by this procedure; and "[w]e make no attempt to enumerate all of the factors which may be considered by the trial court," leaving that to its sound discretion. Hammond v. City of Gadsden, 493 So.2d at 1379. We do, however, reaffirm the substantive rules of law, stated in our earlier opinion in this case, "that a trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; that a trial court may not substitute its judgment for that of the jury; and that there can be no ironclad rule in considering the adequacy or excessiveness of a verdict. Each case must be determined by its own facts and on its own merits." Opinion after remand at 833, citing Hammond v. City of Gadsden, supra. (Emphasis added.)
We noted in our second opinion in this case that Industrial Chemical did not provide either the trial court (on post-judgment review) or this Court with financial data evidencing and supporting its statement that it would face imminent financial destruction if the awards were allowed to stand. Further, we determined that Industrial Chemical's culpability, after a thorough review of the record, was accurately reflected by the verdicts, and that the verdicts were appropriate and desirable for discouraging similar conduct by others in the future. On rehearing, Industrial Chemical submits no argument on any of the mitigating factors listed above, and we decline to grant the application for rehearing to give it the opportunity to do so.[4] Industrial Chemical received the process due to guarantee "fundamental fairness" in the jury's verdicts, and, consequently, we find no violation of the Fourteenth Amendment as applied to the imposition of punitive damages under the wrongful death act.
OPINION EXTENDED; APPLICATIONS DENIED.
JONES, ALMON, SHORES and STEAGALL, JJ., concur.
MADDOX and HOUSTON, JJ., concur in part and dissent in part.
MADDOX, Justice (concurring in part and dissenting in part).
For my views on this case, see my concurring in part and dissenting in part opinion filed January 16, 1989, at 833.
Additionally, I would stay the execution of this judgment, however, pending a decision *840 of the Supreme Court of the United States in its review of Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc., 845 F.2d 404 (2d Cir.1988), cert. granted, ___ U.S. ___, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988).
HOUSTON, J., concurs.
NOTES
[1] Industrial Chemical's argument that punitive damages should be constitutionally restricted by the Eighth Amendment proscription against cruel and unusual punishments and excessive fines centers on the proposition that no mechanism exists for limiting punitive damages awards. Industrial Chemical's suggested mechanism is that the award be proportionate to the "penalty" and "circumstances" of the case, presumably leaving the measurement and determination of the proportion to the trial court.

Industrial Chemical overlooks the fact that a mechanism exists in Alabama to review damages awards. Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), requires a trial court to reflect in the record its reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages. Factors appropriate for the trial court's consideration include the defendant's culpability, the desirability of discouraging similar conduct in the future, and the impact upon the parties. These factors are identical to those proposed by Industrial Chemical to determine the proportion of the "penalty" to the "circumstances." We are unwilling to allow the trial court authority to limit a damages award as a matter of law, as Industrial Chemical would suggest. A jury determination of the amount of damages is the essence of the right to trial by juryto go beyond the procedural mechanisms now in place for reduction of a verdict and to bind the jury's discretion is to deny this constitutional right.
[1] Justice Shores, writing for the majority in Jackson v. City of Florence, 294 Ala. 592, 598, 320 So.2d 68, 73 (1975), put it this way: "As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them."
[2] "New occasions teach new duties;

"Time makes ancient good uncouth;
"They must upward still, and onward,
"Who would keep abreast of Truth."
From "The Present Crisis," by James Russell Lowell.
[1] We note that the writ of certiorari was granted in Kelco Disposal on December 5, 1988, more than two months after our first opinion was released.
[2] To limit the jury's discretion other than by proper instruction as to the circumstances under which punitive damages are awarded, would appear to violate the right of trial by jury guaranteed by Article I, § 11, of the Alabama Constitution of 1901 ("That the right of a trial by jury shall remain inviolate"):

"The following propositions of law, each of which is involved in this case, are deemed to be either axiomatic or undeniable:
"....
"(7) To except these individual and inalienable rights of the people out of the general powers of government is to prohibit the Legislature, the executive, or the judicial branch, one or all, from destroying or impairing such reserved rights of the people.
"(8) To provide that such reserved rights shall forever remain inviolate is to forbid the sovereign through the legislature, executive, or judicial department, one or all, from ever burdening, disturbing, qualifying, or tampering with, these rights, to the prejudice of the people."
Alford v. State, 170 Ala. 178, 54 So. 213 (1910).
See Alabama Pattern Jury Instructions 11.01 (punitive damages may be awarded "where the plaintiff reasonably satisfies the jury from the evidence that plaintiff has been (willfully or) wantonly injured or damaged by the defendant"); 11.03 (the jury must take into consideration "the character and degree of the wrong as shown by the evidence in the case, and the necessity of preventing similar wrongs"); and 11.18 (the jury's verdict "should be directly related to the culpability of the defendant(s) and necessity of preventing similar wrongs in the future"). Alabama Pattern Jury Instructions Civil (1974).
[3] "[A] jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that a trial court, pursuant to A.R.Civ.P. 59(f), and this Court, pursuant to Code 1975, § 12-22-71, may interfere with a jury verdict. Insofar as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure.... Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive." Hammond v. City of Gadsden, 493 So.2d at 1379.
[4] Industrial Chemical chose not to submit adequate argument on this issue in its first brief as appellant, in its reply brief, its post-remand brief, or its brief in support of its application for rehearing. Industrial Chemical has been given every opportunity to "address this pressing issue," and it has not done so. We decline to allow it a fifth opportunity to do so.